# In the United States Court of Federal Claims

BID PROTEST
Nos. 19-1115C; 19-1162C; 19-1168C;
19-1169C; 19-1178C;
19-1189C; 19-1296C
(Consolidated)
(Filed Under Seal: June 4, 2020 | Reissued: June 25, 2020)*

| | | |
|---|---|---|
| TECHNOLOGY INNOVATION ALLIANCE LLC, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Keywords: Bid Protest; DISA; Technical Evaluations; Substantively Indistinguishable; Office Design Group v. United States; Best Value Tradeoff |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| TIBER CREEK CONSULTING, INC.; VALIDATEK, INC.; INNOVATIVE GOVERNMENT SOLUTIONS JV, LLC; MISSION1ST GROUP, INC.; and REDTEAM, LLC, | ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

*W. Brad English*, Maynard, Cooper & Gale, P.C., for Plaintiff Technology Innovation Alliance LLC, Huntsville, AL. *Emily J. Chancy* and *Michael W. Rich*, Maynard, Cooper & Gale, P.C., Huntsville, AL, Of Counsel.

*Ryan C. Bradel*, Ward & Berry, PLLC, Washington, DC, for Plaintiff DirectViz Solutions, LLC.

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. As requested by the parties, certain proprietary and pricing information has been redacted, as noted in brackets, for this public version.

*Stuart B. Nibley*, K&L Gates, LLP, Washington, DC, for Plaintiff Foxhole Technology, Inc. *Amy C. Hoang*, *Erica L. Bakies*, and *Sarah F. Burgart*, K&L Gates LLP, Washington, DC, Of Counsel.

*Ronald S. Perlman*, Holland & Knight LLP, Washington, DC, for Plaintiff TENICA & Associates, LLC. *Mary B. Bosco* and *Daniel P. Hanlon*, Holland & Knight LLP, Miami, FL, Of Counsel.

*David B. Dixon*, Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, for Plaintiff CollabraLink Technologies, Inc. *Meghan D. Doherty* and *Robert C. Starling*, Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, Of Counsel.

*Paul A. Debolt*, Venable LLP, Washington, DC, for Plaintiff Tapestry Technologies, Inc. *Christopher G. Griesedieck* and *Christina E. Wood*, Venable LLP, Washington, DC, Of Counsel.

*Michael J. Gardner*, Greenberg Traurig, LLP, McLean, VA, for Plaintiff Sealing Technologies, Inc. *Shomari B. Wade* and *Brett A. Castellat*, Greenberg Traurig, LLP, McClean, VA, Of Counsel.

*Joshua A. Mandlebaum* and *Richard P. Schroeder*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas G. Edelschick*, *Mikki Cottet*, and *Elizabeth A. Speck*, Senior Trial Counsel, *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Travis L. Vaughan*, Procurement and Intellectual Property Attorney, Office of General Counsel, Defense Information Systems Agency, Ft. Meade, MD, Of Counsel.

*Beth V. McMahon*, ReavesColey, PLLC, Chesapeake, VA, for Defendant-Intervenor Innovative Government Solutions JV, LLC. *J. Bradley Reaves*, ReavesColey, PLLC, Chesapeake, VA, Of Counsel.

*Laurel A. Hockey*, Cordatis LLP, Arlington, VA, for Defendant-Intervenor ValidaTek, Inc. *David Cohen* and *John J. O'Brien*, Cordatis LLP, Arlington, VA, Of Counsel.

*Devon E. Hewitt* and *Scott E. Dinner*, Protorae Law PLLC, Tysons, VA, for Defendant-Intervenor Tiber Creek Consulting, Inc.

*Justin A. Chiarodo*, Blank Rome LLP, Washington, DC, for Defendant-Intervenor Mission1st Group, Inc. *Adam Proujansky* and *Carolyn Cody-Jones*, Blank Rome LLP, Washington, DC, Of Counsel.

*Cameron Hamrick*, Miles & Stockbridge P.C., Washington, DC, for Defendant-Intervenor RedTeam, LLC. *C. Peter Dungan*, Miles & Stockbridge P.C., Washington, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

These seven consolidated bid protests arise out of award decisions made by the Defense Information Systems Agency ("DISA" or "the agency") in connection with its "Systems Engineering Technology and Innovation" ("SETI") procurement. Each of the protesters submitted proposals in response to DISA's solicitation. None were among the twenty-five offerors selected as recipients of the multiple-award task-order contracts that DISA set aside for small businesses.

The protests have several common themes. First and foremost, each of the protesters contends that—in evaluating the technical merit of their proposals—the agency either failed to recognize strengths and/or assigned the proposals undeserved weaknesses. The protesters characterize the agency's technical determinations as arbitrary and, in many instances, claim that they reflect disparate treatment.

A second common theme of the consolidated protests concerns the agency's use of adjectival ratings when evaluating the technical merits of the proposals. According to many of the protesters, the agency applied those ratings mechanically and gave them undue importance. These protesters complain in particular about the substantial advantage enjoyed by competitors that received an "Outstanding" rating on the first of the four evaluation factors (entitled "Innovation"). They contend that the agency gave insufficient consideration to the other technical factors and/or to price when making its award decisions. Some of the protesters also contend that the agency's price reasonableness analysis was flawed.

The Court has carefully reviewed the voluminous briefs and the administrative record in these cases. It concludes that—given its narrow scope of review, the highly technical subject matter of the procurement, the careful and well-documented multi-stage evaluation process the agency employed, and the Plaintiffs' failure to show that the agency committed any legal error— none of the Plaintiffs have established entitlement to relief. Plaintiffs' motions for judgment on the administrative record must therefore be denied, and the government's motion granted in its entirety.

## BACKGROUND

## I.     The Solicitation

### A.     Overview

DISA is a combat support element of the U.S. Department of Defense ("DoD"). On February 22, 2017, it issued Solicitation No. HC1047-17-R-0001 ("the Solicitation"), which requested proposals for indefinite delivery/indefinite quantity ("IDIQ") multiple-award task order contracts for SETI projects in support of DISA and DoD. Admin R. ("AR") Tab 1 at 1, 8. The services to be provided included "information technology [] engineering services, expertise, and support in the planning, research, development, integration, and implementation activities for future, proposed, current and legacy [DoD] and [DISA] IT capabilities, services, and systems." Id. at 11.

It was DISA's stated intent to award ten contracts on an "unrestricted" basis and twenty contracts restricted to small-business offerors. Id. at 103. DISA reserved the right, however, to issue "more, less, or no contracts at all." AR Tab 5 at 366 (Amendment 0004 of the Solicitation issued on March 20, 2017).[1] All of the plaintiffs in these consolidated cases competed unsuccessfully for small-business awards.

### B.    Evaluation Criteria

DISA announced that it would make awards to the offerors whose proposals presented the best value to government based upon an integrated assessment of five evaluation factors: Innovation (Factor 1), Past Performance (Factor 2), Problem Statements (Factor 3), Utilization of Small Business (Factor 4), and Price/Cost (Factor 5). Id. at 386–87. The non-price factors were ranked in descending order of importance. Thus, "Factor 1 [wa]s more important than Factor 2 which [wa]s more important than Factor 3, [etc.]." Id. at 387. The four non-price factors, when combined, were "significantly more important than cost or price," in accordance with FAR 15.304(e). Id.

### 1.    Innovation (Factor 1)

As noted, Factor 1 (Innovation) was identified as the most important of the five evaluative criteria. The Solicitation explained that DISA considered "fostering a creative culture and driving Innovation in defense of the country," to be the "paramount success criteria in executing the SETI [c]ontract." Id. at 375. It advised, therefore, that the government sought the services of "innovative companies that accelerate attainment of new information system capabilities." Id.

For purposes of evaluation, the Solicitation defined "innovative" as "(1) any new technology, process, or method, including research and development; or (2) any new application of an existing technology, process, or method." Id. The Solicitation identified three levels of innovation: 1) "Incremental Improvements" which are "[t]ypically representative of smaller tweaks that advance the core mission and/or a focused effort on continuous improvements to current processes, customer experiences, and mission services"; 2) "Major Advancements," which are "[t]ypically representative of creating a new and enhanced way of doing business and/or a new and enhanced way for the customer to interact with the system"; and 3) "Disruptive Innovation," which is "[t]ypically representative of an innovation that transforms an existing market or sector by introducing simplicity, convenience, accessibility, and affordability where complication and high cost are the status quo." Id.

The Solicitation instructed offerors to address five innovation-related topics in their proposals: (1) Corporate Philosophy/Culture on Innovation; (2) Investment in Innovation; (3) History of Engineering and Deploying Innovative Solutions; (4) Outreach and Participation; and

---

[1] The Solicitation was amended five times, most recently on March 23, 2017. See AR Tab 6. The substance of these amendments is not relevant to the present protests. The Court cites to the version of the Solicitation contained in the record as Amendment 0004 because it is the most recent and complete version available.

(5) Certifications, Accreditations, Awards, Achievements, and Patents. <u>Id.</u> at 376–78. For each topic, the offerors were required to answer a series of questions.

For example, under the topic of Corporate Philosophy/Culture on Innovation, offerors were directed to provide their definition of innovation and to explain, among other things: how they managed risk and would share that risk with DISA; how they supported their employees' pursuit of innovation; and how they tracked innovation. <u>Id.</u> at 376–77. Under the Investment in Innovation topic, offerors were required to describe their philosophy on innovation investments; how they trained employees regarding their philosophy; their investment in laboratory and testing space; and their knowledge management methodology. <u>Id.</u> at 377. With regard to the History of Engineering and Deploying Innovative Solutions topic, offerors were asked to describe: their history of innovation, including any failures; their experience of developing solutions and sustaining them from infancy through delivery (especially if related to DISA missions); and other company models for integrating innovation. <u>Id.</u> Under the topic of Outreach and Participation, offerors were to identify any relationships with and contributions made to research organizations. <u>Id.</u> at 377–78. Finally, offerors were required to list any certifications, accreditations, awards, achievements, or patents received for innovation. <u>Id.</u> at 378.

The rating under Factor 1 would be based on the "consideration of the strengths, weaknesses, significant weaknesses, uncertainties and deficiencies assessed." <u>Id.</u> at 387. The agency would use the color/adjective and risk ratings set forth in the following table:

| Combined Technical/Risk Ratings for Innovation | | |
|---|---|---|
| **Color** | **Rating** | **Description** |
| BLUE | Outstanding | Proposal addresses all Innovation elements and indicates an exceptional approach and understanding of Innovation. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| PURPLE | Good | Proposal addresses all Innovation elements and indicates a thorough approach and understanding of Innovation. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| GREEN | Acceptable | Proposal addresses all Innovation elements and indicates an adequate approach and understanding of Innovation. Strengths and weaknesses, if any, are offsetting or will have little or no impact on Contract performance. Risk of unsuccessful performance is no worse than moderate. |

| | | |
|---|---|---|
| YELLOW | Marginal | Proposal does not clearly address all Innovation elements and has not demonstrated an adequate approach and understanding of Innovation. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| RED | Unacceptable | Proposal does not address all Innovation elements and contains one or more deficiencies. Proposal is unawardable. |

Id. at 387–88.

According to the Solicitation, a proposal could receive a more favorable rating by demonstrating any of the following: "long term corporate philosophy regarding [i]nnovation"; "continuous investment in [i]nnovation through evidence of sustained year-after-year investment in technologies and innovative ways to develop new capability, improve service, reduce costs, and create efficiencies"; "validated processes and procedures" that yielded results "based on innovative processes"; "evidence of ongoing corporate investment in tools, training, facilities, personnel and equipment"; "development of prototypes and solutions to mitigate issues and risk relevant to the SETI PWS [(Performance Work Statement)]"; and "[e]xtensive publications on the topic of [i]nnovation, including books and white papers." Id. at 388.

## 2.     Past Performance (Factor 2)

Under Factor 2, offerors were required to supply a summary of up to three relevant past performance examples setting forth "what aspects of the [referenced c]ontracts they deem relevant and to what specific task areas of the proposed effort they relate." Id. at 378. Relevant experience was to be included in a "Past Performance Information Template," which was Attachment 4 to the Solicitation. Id.; see also AR Tab 1 at 143–45 (Past Performance Information Template).

The Solicitation advised that "[p]rojects [which] demonstrate [i]nnovation, multiple experiences or more technically difficult work may receive higher relevancy ratings." AR Tab 5 at 378. For each past performance example, offerors were required to submit formal performance evaluations if available. Id. If no evaluation was available, the offeror was directed to use the "Past Performance Questionnaire and Cover Letter" accompanying the Solicitation as Attachment 5. Id. at 379–80; see also AR Tab 1 at 146–51 (Past Performance Evaluation Questionnaire Form).

The Solicitation provided that the contract efforts supplied as references "should demonstrate as many of the project types included in the PWS (either individually or in combination thereof) as possible." AR Tab 5 at 379. It specified that such project types "may include," among others, "[p]rojects that engineered, implemented and tested a [s]olution," "[e]fforts that delivered or provided an innovative solution," and "[p]rojects that delivered innovative technical solutions designed to deliver new or enhanced technologies and services

faster and more efficiently." Id. DISA cautioned that, ultimately, "the burden of providing detailed, current, accurate and complete past performance information rest[ed] with the [o]fferor." Id. at 380.

The past performance evaluation was designed to "assess[] the degree of confidence the Government h[ad] in an [o]fferor's ability to supply solutions[] and services that me[t] user's needs, based on a demonstrated record of performance." Id. at 388. It would include an assessment of recency; experience earned more than three years before the date of the Solicitation would not be evaluated. Id. The government would then rate the relevancy of the past performance reference, using the following criteria:

| Past Performance Relevancy Ratings | |
|---|---|
| **Rating** | **Definition** |
| VERY RELEVANT | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| RELEVANT | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| SOMEWHAT RELEVANT | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| NOT RELEVANT | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

Id. at 389. Contracts that contained innovative solutions were considered "more relevant than those that did not." Id.

Past performance examples found "Not Relevant" were not further evaluated. Id. Those found relevant (at any level) would receive a performance quality assessment rating using the following criteria:

| Past Performance Quality Assessment | |
|---|---|
| **Quality Assessment Rating/Color** | **Description** |
| EXCEPTIONAL (E)/BLUE | During the Contract period, Contractor performance meets or met Contractual requirements and exceeds or exceeded many to the Government's benefit. The Contractual performance of the element or sub-element being assessed was accomplished with few minor problems for which corrective actions taken by the Contractor were highly effective. |

| | |
|---|---|
| VERY GOOD (VG)/PURPLE | During the Contract period, Contractor performance meets or met Contractual requirements and exceeds or exceeded some to the Government's benefit. The Contractual performance of the element or sub-element being assessed was accomplished with some minor problems for which corrective actions taken by the Contractor were effective. |
| SATISFACTORY (S)/GREEN | During the Contract period, Contractor performance meets or met Contractual requirements. The Contractual performance of the element or sub-element being assessed contained some minor problems for which corrective actions taken by the Contractor appear or were satisfactory. |
| MARGINAL (M)/YELLOW | During the Contract period, Contractor performance does not or did not meet some Contractual requirements. The Contractual performance of the element or sub-element being assessed reflects a serious problem for which the Contractor has not yet identified corrective actions. The Contractor's proposed actions appear only marginally effective or were fully or not implemented. |
| UNSATISFACTORY (U)/RED | During the Contract period, Contractor performance does not or did not meet most Contractual requirements and recovery in a timely manner is not likely. The Contractual performance of the element or sub-element contains serious problem(s) for which the Contractor's corrective actions appear or were ineffective. |
| NOT APPLICABLE (N)/WHITE | Unable to provide a rating. Contract did not performance for this aspect. Do not know. |

Id. at 389–90.

Based on the relevancy and quality assessments of the past performance examples submitted, the agency then assigned an integrated performance confidence assessment rating as follows:

| Performance Confidence Assessments | |
|---|---|
| **Rating** | **Description** |
| SUBSTANTIAL CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |

| SATISFACTORY CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
|---|---|
| NEUTRAL CONFIDENCE | No recent/relevant performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorable or unfavorably on past performance. |
| LIMITED CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| NO CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

Id. at 390.

### 3.    Problem Statement Narratives (Factor 3)

Under Factor 3, the government evaluated offerors' responses to hypothetical problems included with the Solicitation at Attachment 7. Id. at 380. Offerors were required to "provide as specifically as possible the actual methodology to be used for accomplishing/satisfying the[] requirements" in the narratives. Id. Though the problem statements were "notional in nature," the Solicitation explained, "[t]hey give the Government insights into each offeror's ability to meet DISA requirements in numerous and diverse technical areas and into each offeror's problem solving methodologies related to broad problems that could be solved by any number of technologies." Id.

Offerors for the small business restricted suite of awards were required to respond to Problem Statement No. 3 and Problem Statement No. 4. Id. The problem statements were of equal weight. Id. at 391.

The government's evaluation of Factor 3 "us[ed] a combined technical/management rating and risk rating," which considered "risk in conjunction with the strengths, weaknesses, and deficiencies in determining technical ratings." Id. at 390. The ratings assigned would be based on the criteria set forth in the following table:

| Combined Technical/Risk Rating | | |
|---|---|---|
| **Color** | **Rating** | **Description** |
| BLUE | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| PURPLE | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| GREEN | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on Contract performance. Risk of unsuccessful performance is no worse than moderate. |
| YELLOW | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| RED | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

Id. at 391.

### 4. Small Business Participation and Commitment Plan (Factor 4)

Under Factor 4, proposals were evaluated "on the level of proposed participation of U.S. small businesses in the performance of th[e] acquisition." Id. at 382. Offerors were required to "articulate how small businesses will participate through performance as a small business Prime Offeror and/or 'first tier' small business subcontracting only." Id. (emphasis removed). In evaluating an offeror's small business participation plan, the agency considered: the extent to which small businesses were identified in the proposal; the commitment to use small businesses; whether the offeror identified the complexity and variety of work to be performed by small businesses; the extent of participation of small business prime offerors and small business subcontractors as defined by "the percentage of the value of the total acquisition"; and the goals proposed by the offeror in terms of a "percentage of the total acquisition value (TAV)." Id. at 383. The government suggested, but did not require, that offerors use the "Small Business

Participation Proposal" included as Attachment 8 of the Solicitation. Id.; see also AR Tab 1 at 160–61 (Small Business Participation and Commitment Proposal Format).

Offerors would be assigned one of the following ratings for Factor 4:

| Small Business Rating Method | | |
|---|---|---|
| **Color Rating** | **Adjectival Rating** | **Description** |
| BLUE | Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| PURPLE | Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| GREEN | Acceptable | Proposal indicates an adequate approach and understanding of the small business objectives. |
| YELLOW | Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| RED | Unacceptable | Proposal does not meet small business objectives. |

AR Tab 5 at 392.

### 5. Price/Cost (Factor 5)

Offerors were to submit their proposed rates in a spreadsheet appended to the Solicitation as Attachment 9. Id. at 384. The total proposed price would "consist of the [contractor's] proposed rates for the base period, all option periods, to include the option pricing for [an] additional six-month period." Id. Only the total proposed price would be used to calculate tradeoffs between price and non-price factors. Id. The Solicitation stated that price proposals would be evaluated using at least one of the techniques detailed in FAR 15.404 to determine reasonableness and completeness. Id. at 393.

### C.   The Source Selection Review Process

The Solicitation prescribed a multi-level evaluation and selection process. See id. at 393–94. At the first stage, five separate technical evaluation boards ("TEBs") would review each proposal. These were the Innovation Evaluation Board ("IEB"), the Past Performance Evaluation Board ("PPEB"), the Problem Statement Evaluation Board ("PSEB"), the Small Business Evaluation Board ("SBEB"), and the Price Evaluation Board ("PEB"). Id.

Upon completion of their evaluations, the Chair of each of these TEBs would brief the Source Selection Evaluation Board ("SSEB"). See AR Tab 65d at 4690. The SSEB would then measure the TEBs' evaluations "against the solicitation requirements and the approved evaluation criteria to ensure an equitable, impartial, and comprehensive evaluation against the solicitation requirements." AR Tab 5 at 393. According to the Solicitation, "[t]he fundamental

responsibility of the SSEB [wa]s to provide the Source Selection Advisory Council (SSAC) and the Source Selection Authority (SSA) with information to make informed and reasoned selections." Id. at 393–94. The SSEB would therefore "prepare summary reports containing adjectival assessments for each factor and their supporting rationale, including the costs/prices for each Offeror and brief the SSAC." Thereafter, the SSAC would prepare "a comparative analysis and brief the SSA." Tab 5 at 394.

### D.    The Evaluations and Award Decisions

The agency received 112 proposals for the restricted suite. AR Tab 65d at 4688. Thirteen of those proposals were removed from consideration because they were either late, incomplete, or submitted by mail rather than electronically, leaving ninety-nine to be evaluated. Id.

The TEBs convened from April 10, 2017 through February 20, 2018 to perform the technical evaluations. AR Tab 63 at 4566 (SSAC report). The SSEB began meeting on December 4, 2017 to review those evaluations. Id. Its review included a briefing by each TEB Chair. Id. Ultimately, the SSEB prepared a report of almost 1100 pages which summarized the evaluations of every proposal under each of the five factors. See generally AR Tab 65d.

In the meantime, the contracting officer ("CO") recorded the results of the PEB's price fairness and reasonableness analysis in a memorandum dated March 6, 2019. AR Tab 65c at 4678. The PEB had compared the total proposed prices of each offeror against one another and against the Independent Government Cost Estimate ("IGCE"). Id. It also determined the average total proposed price of all offerors ($193,870,790) and the median price ($187,899,682). Id. Comparatively, seventy-nine offerors were lower than the IGCE and twenty were higher. Id. Forty-three offerors were above the average and fifty-six were below the average. Id. The highest proposed price was $381,206,594 and the lowest was $99,924,321, a difference of $281,282,273. Id.

The CO acknowledged a "large variance amongst the total proposed prices and the individual labor rates themselves." Id. at 4679. He stated, however, that the large variance "was not unanticipated and did not cause a concern that the Government would pay an unreasonably high price." Id. The CO explained that "the solicitation introduced a great amount of risk of paying a high, but not unreasonable, price, based upon the need to obtain a range of potentially innovative solutions." Id. He further noted that the Solicitation also "included significant risk for any offeror" and for that reason "offerors had to make business decisions on how to strategize their pricing which led to the wide dispersion of prices." Id. at 4680. The government, he noted, "accepted the potential risk of paying higher prices, but not unreasonable prices, for higher quality solutions." Id. In short, the CO concluded, "the risk of paying too much for requirements is low compared to the needs of the Government." Id. This was "particularly" true, he found, "given the mitigating factor that there will be competition to refine prices at the order level." Id.

The SSAC reviewed the SSEB report and the CO's price memorandum. It prepared a "written comparative analysis of offers and recommendations" for the Source Selection Authority ("SSA"). AR Tab 5 at 394. The SSAC's report explains the basis for its recommendations in detail.

The SSAC explained that it had removed forty offerors from consideration at the outset because they received "Unacceptable" ratings for either the Innovation or Problem Statement factors. AR Tab 63 at 4568–69. Of the fifty-nine proposals still under consideration, twenty had received an "Outstanding" rating for Factor 1, seventeen were rated "Good," seven were rated "Acceptable," and fifteen were rated "Marginal." Id. at 4567, 4569; AR Tab 63a (final ratings table).

The SSAC started its comparative analysis by reviewing the proposals that had received an "Outstanding" rating for Factor 1 "from the highest technically rated to the lowest technically rated [] considering the specific number and individual benefits provided by the proposal's strengths." AR Tab 63 at 4569. Ultimately, the SSAC recommended that eighteen of these offerors be awarded a contract. The other two offerors with "Outstanding" ratings on Factor 1 received "Marginal" ratings on both Problem Statements, and were not recommended for an award.

The SSAC next reviewed the proposals that received a "Good" rating for Factor 1, again in descending order from the highest to the lowest technically rated. It recommended an award to five of the twenty-five offerors whose proposals received such a rating. Id. at 4656. Therefore, it recommended a total of twenty-three proposals for award. Id. The SSA reviewed and concurred with the CO's conclusions as to price fairness and reasonableness as well as the SSAC's recommendations. AR Tab 65 (SSA report). As a result, it concluded that the following offerors should receive awards:

| Offeror | Factor 1 - Innovation | Factor 2 - Past Performance | Factor 3 - PS3 Rating | Factor 3 - PS4 Rating | Factor 4 - Small Business | Factor 5 - Price | Price Rank |
|---|---|---|---|---|---|---|---|
| Bluestone Logic | Outstanding | Substantial | Outstanding | Good | Outstanding | $191,570,152 | 55 |
| Riverside Engineering | Outstanding | Substantial | Good | Outstanding | Acceptable | $134,262,782 | 7 |
| IE-TEK - Innovation Evolution Technologies | Outstanding | Substantial | Acceptable | Good | Outstanding | $138,451,009 | 11 |
| Innoplex, LLC | Outstanding | Substantial | Marginal | Outstanding | Good | $240,795,374 | 88 |
| Credence Management Solutions | Outstanding | Substantial | Marginal | Acceptable | Outstanding | $129,106,382 | 5 |
| SuprTEK - Superlative Technologies, Inc. | Outstanding | Substantial | Acceptable | Marginal | Outstanding | $209,845,119 | 69 |
| Mission Support, LP | Outstanding | Substantial | Marginal | Acceptable | Acceptable | $165,958,849 | 30 |
| ISI - Integrated Systems, Inc | Outstanding | Satisfactory | Outstanding | Outstanding | Good | $233,755,046 | 83 |
| ASE - Applied Systems Engineering | Outstanding | Satisfactory | Outstanding | Outstanding | Good | $237,704,094 | 87 |
| ValidaTek, Inc. | Outstanding | Satisfactory | Outstanding | Good | Good | $221,476,895 | 78 |
| BCMC, LLC | Outstanding | Satisfactory | Outstanding | Acceptable | Good | $157,111,256 | 20 |
| DHPC Technologies, Inc. | Outstanding | Satisfactory | Acceptable | Outstanding | Good | $160,919,241 | 24 |
| Tibercreek | Outstanding | Satisfactory | Good | Good | Acceptable | $124,458,137 | 4 |
| SAAI - Semper AASKI Alliance, Inc. | Outstanding | Satisfactory | Marginal | Outstanding | Acceptable | $187,468,832 | 48 |
| Synergy | Outstanding | Satisfactory | Marginal | Good | Acceptable | $206,858,651 | 67 |
| IPT - Interactive Process Technology, LLC | Outstanding | Neutral | Acceptable | Outstanding | Good | $219,797,754 | 76 |
| ASG - A Square Group | Outstanding | Neutral | Acceptable | Marginal | Good | $175,937,566 | 40 |
| Affinity Innovations, LLC | Outstanding | Neutral | Marginal | Acceptable | Acceptable | $137,525,436 | 10 |
| IGS - Innovative Government Solutions JV, LLC | Good | Substantial | Outstanding | Outstanding | Outstanding | $160,264,170 | 23 |
| Incadence Strategic Solutions Corporation | Good | Substantial | Outstanding | Outstanding | Good | $180,121,254 | 42 |
| NetCentric Technology, LLC | Good | Substantial | Outstanding | Acceptable | Good | $132,966,810 | 6 |
| Volant | Good | Substantial | Acceptable | Outstanding | Good | $174,363,631 | 39 |
| Synaptek Corporation | Good | Satisfactory | Outstanding | Good | Good | $182,449,429 | 43 |

Id. at 4659.103.

The Agency notified successful offerors of its award decision on July 8, 2019. See generally AR Tab 66. Unsuccessful offerors were notified by letter dated July 9, see generally AR Tab 69, and received debriefing letters the next day, see AR Tabs 70–80.

## II.   GAO Proceedings

CEdge Software Consultants, LLC and Tapestry Technologies, Inc. filed protests challenging the Agency's award decision with the Government Accountability Office ("GAO") on July 19, 2019. AR Tab 104 at 9013; AR Tab 106 at 9238. Shortly thereafter, CyberData Technologies, Inc., Sealing Technologies, Inc., RedTeam LLC, Tenica & Associates LLC, Mission1st Group, Inc., Foxhole Technology, Inc., DirectViz Solutions, LLC, and CollabraLink Technologies, Inc. filed GAO protests. See AR Tabs 108–125.

## III.    The Present Suit

Lead Plaintiff Technology Innovation Alliance LLC ("TIA") (Case No. 19-1115C) filed a protest in the Court of Federal Claims on July 31, 2019, while proceedings were still pending before GAO. ECF No. 1.[2] GAO therefore dismissed the protests before it on August 8, 2019. AR Tab 127 at 10961 (GAO decision). As a result, most of the offerors that had filed GAO protests filed suit in this court: DirectViz Solutions, LLC (Case No. 19-1162C) (filed August 9, 2019); Foxhole Technology, Inc. (Case No. 19-1168C), Tenica and Associates, LLC (Case No. 19-1169), CollabraLink Technologies, Inc. (Case No. 19-1178), and RedTeam, LLC (Case No. 19-1179) (filed August 12, 2019); Tapestry Technologies, Inc. (Case No. 19-1189) (filed August 13, 2019); Mission1st Group, Inc. (Case No. 19-1211) (filed August 15, 2019); CEdge Software Consultants, LLC (Case No. 19-1231) (filed August 19, 2019);[3] and Sealing Technologies, Inc. (Case No. 19-1296C) (filed August 27, 2019).

The Court consolidated all ten protests on August 28, 2019, and designated the TIA protest as the lead case. See, e.g., Consolidation Order, Sealing Techs., Inc. v. United States, No. 19-1296C (Fed. Cl. Aug. 28, 2019), ECF No. 13. On September 5, 2019, the Court granted motions to intervene filed by three successful offerors: Innovative Government Solutions JV, LLC, ValidaTek, Inc., and Tiber Creek Consulting, Inc. ECF No. 54. In accordance with the Court's scheduling order, the Plaintiffs filed their amended complaints and motions for judgment on the administrative record on October 29, 2019. ECF Nos. 70–86.[4]

On December 3, 2019, the government filed a motion to remand the case in part to the agency "to reconsider two aspects of the challenged [] decision." Def.'s Partial Consent Mot. for Voluntary Partial Remand at 1, ECF No. 92. Specifically, the government sought a remand for further consideration of 1) whether "the agency erred in the application of solicitation criteria to the proposed solutions for problem statement 3" and 2) whether "the agency erred in not evaluating two past performance references [submitted by Sealing Technologies] as non-compliant." Id. at 2. The Court granted the motion for partial remand and required the parties to file a joint status report regarding the need for further litigation by December 23, 2019. ECF No. 94.

The parties filed the joint status report as requested on December 23, 2019, informing the Court that, as a result of the remand, the agency planned to make awards to Plaintiffs Mission1st. and RedTeam. ECF No. 97. The agency reaffirmed its decision not to make an award to either TIA or Sealing. Id.

---

[2] Unless otherwise noted, all citations to the Court's electronic case filing system refer to the docket of the lead case, No. 19-1115C.

[3] CEdge Software Consultants LLC voluntarily dismissed its protest on October 25, 2019. ECF No. 69.

[4] On August 19, 2019, the government informed the Court and the parties that DISA had agreed not to award any task order in excess of $500 under the protested procurement before April 30, 2020, unless the Court had reached a decision permitting it to do so. ECF No. 25.

The parties also proposed an amended briefing schedule, id., which the Court adopted, ECF No. 98. The Court dismissed the claims of Mission1st and RedTeam as moot on January 3, 2020. Id. Mission1st and RedTeam subsequently filed motions to intervene on the government's side, ECF Nos. 99–100, which the Court granted, ECF Nos. 109–10.

After the government issued its decision on remand, ECF No. 96, several plaintiffs amended their complaints and pending motions for judgment on the administrative record, ECF Nos. 101–08. The government filed its cross-motion for judgment on the administrative record on February 11, 2020. ECF No. 123. The motions are fully briefed.

On April 10, 2020, the government informed the Court and the parties that "to facilitate judicial review, the Defense Information Systems Agency has agreed not to award any task order in excess of $500 pursuant to the protested contracts before June 5, 2020." ECF No. 148.

The Court has determined that oral argument is unnecessary. For the reasons that follow, the Court finds that the remaining protests lack merit. Accordingly, the Court **DENIES** the pending motions for judgment upon the administrative record filed by the Plaintiffs and **GRANTS** the government's cross-motion.

## DISCUSSION

## I.    Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest in a pre-award, post-evaluation protest if the protester demonstrates that, absent the alleged errors, it would have a "substantial chance" of receiving the award; that is, if the protester "could have likely competed for the contract" but for the alleged errors. Orion, 704 F.3d at 1348–49; see also Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"). The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. Square One Armoring Serv.,

Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)).

Each Plaintiff in this protest challenges the agency's ranking of its proposal and non-selection for award. Their suits thus challenge a procurement decision and fall within the Court's "broad grant of jurisdiction over objections to the procurement process." Sys. Application & Techs., Inc., 691 F.3d at 1381. Moreover, each Plaintiff has sufficiently alleged a direct economic interest in the procurement. Taking the allegations of error to be true—as it must to determine standing—the Court finds that each Plaintiff "could likely have competed for the contract" in the absence of the alleged errors. Accordingly, the Plaintiffs are interested parties and the Court has subject-matter jurisdiction over their claims.

## II.     Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III.    Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). As a result, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

The Court's scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals. As the court of appeals observed in E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996), protests concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." See also RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019) ("[E]valuations of proposals for their technical quality involve the specialized expertise of an agency's subject-matter experts."); CSC Gov't Sols., Inc. v. United States, 129 Fed. Cl. 416, 434 (2016) (explaining that great deference must be afforded to an agency where the court reviews a technical evaluation "because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government in that regard" (internal quotation marks omitted)). The Court's function is therefore limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).

## IV.   Merits

### A.   Technology Innovation Alliance (Case No. 19-1115C)

#### 1.   The Agency's Initial Evaluation

TIA submitted its proposal on April 4, 2017. AR Tab 160 at 25711 (TIA proposal). TIA's proposal earned six strengths and was assigned two weaknesses under Factor 1. AR Tab 65d at 5698–00 (SSEB report). For Factor 3, Problem Statement No. 3, TIA was assigned one strength, which was offset by one weakness and one significant weakness. Id. at 5702. No strengths or weaknesses were assessed for Factor 3, Problem Statement No. 4. For Factor 4, TIA received three strengths and no weaknesses. Id. at 5704.

The TEBs assigned TIA's proposal the following adjectival ratings, which were affirmed by the SSEB and the SSAC:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Satisfactory | Marginal | Acceptable | Acceptable |

Id. at 5705; AR Tab 65e at 5852 (SSAC memorandum). TIA's proposed price was [***], which the agency ranked [***] out of the ninety-nine offerors. AR Tab 65e at 5852.

The SSAC concluded that TIA's proposal "was priced in the middle" and "was not one of the highest technically rated." AR Tab 65e at 5853. It therefore recommended against awarding a contract to TIA. The SSA agreed and TIA was not selected as an awardee. AR Tab 65 at 4659.79–.81 (Source Selection Decision Document ("SSDD")).

18

### 2.    Remand and Final Evaluation

After the present protest was filed, the agency requested a remand during which it re-evaluated the marginal rating it assigned to TIA's proposal with respect to Problem Statement No. 3. ECF No. 92. On December 20, 2019, the Agency filed a Memorandum for the Record containing the SSA's analysis and decision on remand. ECF No. 96. It reflects that TIA's rating for Problem Statement No. 3 was changed from "Marginal" to "Acceptable," resulting in the following adjusted set of adjectival ratings:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Satisfactory | Acceptable | Acceptable | Acceptable |

AR Tab 174 at 30008, ECF No. 96; see also id. at 30010 (noting a rating change from "Marginal" to "Acceptable" for Problem Statement No. 3).

Notwithstanding the upward revision in TIA's rating for Problem Statement No. 3, the SSA again concluded that TIA's proposal was not "among[] the most highly rated or the lowest priced proposals and d[id] not represent a best value to the Government." Id. TIA therefore again did not receive an award.

### 3.    TIA's Protest

In its amended MJAR, TIA alleges that the agency "erred by assigning TIA two weaknesses for its approach to risk in the Corporate/Philosophy/Culture on Innovation aspect" of Factor 1. Pl. TIA's Am. Mot. for J. on the Admin. Rec. & Br. in Supp. Thereof ("TIA MJAR") at 18–21, ECF No. 106 (capitalization altered). It further contends that it was subjected to disparate treatment when it was not assigned three additional strengths under Factor 1. Id. at 21–24. Finally, with respect to Factor 4, TIA argues that the Agency arbitrarily awarded strengths to other offerors based on certifications that TIA also possessed but for which it was not assigned any strengths. Id. at 24. The Court addresses each of these arguments below and finds them without merit.

### a.    Assignment of Weaknesses to "Approach to Risk" Component of TIA's Proposal

The instructions concerning the "Corporate Philosophy/Culture on Innovation" category of Factor 1  required offerors to provide information about, among other things, their "Approach to Risk." AR Tab 5 at 376. Specifically, it required offerors to explain how they "manage risk in an innovative environment" and how they "determine the level of acceptable risk." Id. They were also directed to provide an explanation of how they and DoD should share risk. Id. In addition, the offerors were required to identify "the cost of failure" as well as "who should pay for it." Id. Finally, the offerors were required to state "[h]ow much failure" the government should accept. Id. (internal quotation marks omitted).

The agency assigned two weaknesses to TIA's proposal based on its responses to the "Approach to Risk" questions. AR Tab 65d at 5700. First, it concluded that TIA "did not adequately address how it would share risk with the DOD." Id. According to the agency "[t]his flaw . . . increases [TIA's] risk of failure to be innovative because a lack of understanding of how to allocate risk between the company and the DOD throughout the development lifecycle could impede managing and mitigating risks for future SETI projects." Id. Second, the agency concluded that TIA "did not provide sufficient information as to how much failure they believed the Government should accept." Id. It observed that this flaw "raises the risk of failure to be innovative because the Offeror's approach to failure sharing between themselves and the Government is not well developed and could potentially impede innovation in future SETI task orders." Id.

TIA argues that it was arbitrary and irrational for the agency to conclude that its proposal did not adequately address risk sharing or how much failure it believed the agency should accept. It observes that "TIA's proposal described [***] and the risk sharing partnership it contemplated between TIA and the government." TIA MJAR at 19 (citing AR Tab 160 at 25935–36). It further asserts that its proposal [***]. Id. (citing AR Tab 160 at 25935).

As explained above, given the technical nature of the issues, this Court's scope of review of the agency's decision regarding whether TIA satisfactorily addressed the agency's questions is extremely narrow. The agency examined the content of TIA's responses under the "Approach to Risk" subtopic and found them lacking in two critical respects. First, it concluded that TIA did not provide adequate information about how it proposed to share risks with DoD. The record reflects a rational basis for this highly discretionary determination. The focus of the narrative in TIA's proposal was on risks to TIA, and there was scant if any mention of shared risks. See AR Tab 160 at 25935 (describing [***]). Indeed, the word "share" does not appear in the narrative discussing this point. Nor did TIA provide any discernible analysis regarding how much failure the agency should find acceptable under the SETI contract; it merely offered the generalization that [***]. Id.

In reviewing the reasonableness of the agency's determination, it is instructive to compare TIA's responses with those that were not found lacking. The comparison reveals that other offerors supplied more specificity regarding risk sharing than did TIA, in some instances devoting entire sections to the topic. See, e.g., AR Tab 163 at 27250 (Intervenor ValidaTek, Inc. proposal) (explaining that [***]); AR Tab 162 at 26862 (Intervenor Tiber Creek Consulting, Inc. proposal) (explaining that [***]); AR Tab 145 at 19485 (Intervenor Innovative Government Solutions JV, LLC proposal) (explaining in section titled [***]).

Similar results obtain when reviewing other offerors' responses to the question of how much failure the government should be willing to accept. These proposals again contained more specificity than did TIA's. See, e.g., AR Tab 162 at 26862 (Tiber Creek Consulting, Inc. proposal) (explaining [***]); AR Tab 163 at 27251 (ValidaTek proposal) (explaining [***]). It is also instructive that the agency similarly assigned a weakness to another offeror's proposal where, like TIA, it only addressed the effect of failure on the offeror, and not on the government. See AR Tab 65d at 5182 (referring to AR Tab 145 at 19485) (assigning the same weakness to Innovative Government Solutions JV, LLC where the proposal [***]).

In short, the Court concludes that the agency acted within its discretion when it found TIA's proposal deficient with respect to the way it addressed the approach to risk questions posed by the Solicitation. TIA's protest on this ground therefore lacks merit.

### b. Disparate Treatment in Assignment of Two Weaknesses Rather than One under "Approach to Risk" Topic

In addition to challenging the substance of the agency's conclusion that its proposal fell short in addressing its approach to risk, TIA also argues that DISA subjected it to disparate treatment when it assigned the proposal two weaknesses for these shortcomings rather than one. See TIA MJAR at 20. For example, TIA observes, awardee Applied Systems Engineering was assigned one weakness for failing to "provide information as to who should pay for the cost of failure . . . [and information] on how much failure they believe the Government should accept." AR Tab 65d at 4761. In addition, Interop-ISHPI JV, LLC was assigned a single weakness for including an "immature description as to what they perceive the cost of failure to be, who should pay for innovation-related failures at any/all points of the developmental lifecycle, and how much failure the Government should accept." Id. at 5204. And Mission Support, LP was assigned only one weakness for a failure to "provide information as to what they perceive the cost of failure to be . . . [and] a comprehensive understanding of who should pay for innovation-related failures at any/all points of the developmental lifecycle." Id. at 5326. But see id. (assigning a second weakness to Mission Support, LP for failing to "provide information into how their company determines the level of acceptable risk").

As the court of appeals recently held in Office Design Group v. United States, to prevail on a disparate treatment claim a protestor must show either "that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." 951 F.3d 1366, 1372 (Fed. Cir. 2020). Only if a protester meets one of these thresholds can the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." Id. at 1373; see also WellPoint Military Care Corp. v. United States, 953 F.3d 1373, 1378 (Fed. Cir. 2020). Indeed, having the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable "would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings" and "[t]his is not the court's role." Office Design Grp., 951 F.3d at 1373 (citing E.W. Bliss Co., 77 F.3d at 449).

TIA's disparate treatment argument does not meet the Office Design Group standards. The agency assigned two weaknesses to TIA's proposal based on its failure to address both how TIA would share risk with the government and how much failure should be acceptable to the government. None of the comparator proposals that TIA cites were found to have failed to address both of these issues. The deficiencies in the proposals were therefore not substantively indistinguishable. TIA's disparate treatment claim accordingly lacks merit.

### c.     Unequal Assignment of Strengths Under Factor 1

TIA claims that the agency arbitrarily failed to assign three additional strengths to its proposal that it awarded to other offerors with allegedly similar proposals. These disparate treatment claims also do not pass muster under <u>Office Design Group</u>, 951 F.3d 1366.

### i.     Assignment of strength based on awards received

Under Factor 1, the Solicitation required offerors to "[l]ist and describe Awards and Achievements received that were awarded because of Innovation." AR Tab 5 at 378. TIA alleges that it should have been awarded a strength based on its [***]. TIA MJAR at 21–22.

This contention lacks merit. IE-TEK [***]. <u>See</u> AR Tab 143 at 18014 (IE-TEK proposal) (explaining that "IE-TEK [***]"). TIA's proposal, on the other hand, listed the awards it received with little or no explanatory narrative. <u>See</u> AR Tab 160 at 25950. The agency further noted that IE-TEK also [***]. AR Tab 65d at 5131 (IE-TEK proposal evaluation). Because both the awards and the information provided about them in the proposals are materially different, TIA's disparate treatment argument fails.

### ii.     Assignment of a strength based on laboratory facilities

Offerors were required to include information in their proposals regarding their "Investment in Innovation" including their "physical investment in laboratory/testing space," and, if applicable, "the company's 'Virtual Investment' such as cloud technology for 'lab space' and monetary investment of non-physical assets or virtual models." AR Tab 5 at 377. TIA argues that it was arbitrary for the agency not to assign its proposal a strength based on its [***] while at the same time assigning strengths to Bluestone Logic, Innoplex LLC, and IE-TEK based on their [***]. This argument also lacks merit.

TIA's proposal stated that it had [***]. AR Tab 160 at 25942. TIA also referenced [***]. <u>Id.</u>

The proposals of the other offerors that TIA cites—Bluestone Logic, Innoplex LLC, and IE-TEK—similarly provide explanations about the capabilities of their facilities which are different from those of TIA. In addition, they supply information about how they propose to use those capabilities to benefit DISA. For example, Bluestone Logic [***]. AR Tab 133 at 13589 (Bluestone Logic proposal). It specified that [***]. <u>Id.</u>

The proposals submitted by IE-TEK and Innoplex, the other two offerors TIA claims received more favorable treatment, also contain significant detail about their labs and include discussion of the benefits DISA would receive as a result of their facilities. <u>See</u> AR Tab 143 at 18011 (IE-TEK proposal) (explaining [***]); <u>id.</u> at 18012 (identifying, specifically, [***]); AR Tab 142 at 17446 (Innoplex, LLC proposal) (explaining that [***]).

TIA argues that its facility "offered the Agency the same benefits that Bluestone's, IE-TEK's and Innoplex's did—[***] and that it was arbitrary and irrational for the agency to "fail to recognize those benefits in TIA's offering." TIA MJAR at 23. But the Court hardly has the expertise to decide whether the benefits offered by each of these proposals is "the same." <u>Id.</u>

What the Court can tell is that the proposals of TIA and the other offerors have different features and are not "substantively indistinguishable." Office Design Grp., 951 F.3d at 1372. Consistent with the reasoning in Office Design Group, the Court therefore has no basis for second guessing the determinations of the agency's subject matter experts regarding which proposals should be assigned strengths and which should not. TIA's challenge based on the agency's failure to assign it a strength for its laboratory facilities must therefore be rejected.

### iii. Assignment of strengths based on partnerships

Under Factor 1, offerors were required to provide information about their "outreach and participation," including their "relationships, partnerships, and/or interactions with fundamental research and commercial/academic sector." AR Tab 5 at 377. In its proposal, TIA responded to this requirement by stating that it was an [***]. AR Tab 160 at 25937. TIA asserts that it should have been awarded a strength for its partnership with these entities, because another offeror, Tapestry Technologies ("Tapestry"), received a strength for partnerships with [***] identified. TIA MJAR at 24.

But again, the proposals are not substantively the same. Tapestry provided [***]. See AR Tab 159 at 25476–78 (Tapestry Technologies proposal). TIA merely listed the entities by name and identified them as [***]. AR Tab 160 at 25937. TIA's disparate treatment claim as to this aspect of its evaluation therefore also lacks merit.

### d. Failure to Assign a Strength Under Factor 4 (Utilization of Small Business)

Under Factor 4, all offerors were required to submit a "small business participation and commitment plan" to "be evaluated on the level of proposed participation of U.S. small businesses in the performance of [the contract]." AR Tab 5 at 382. TIA argues that the agency acted arbitrarily when it assigned strengths to other offerors' proposals under Factor 4, based on their possession of certain certifications, while not awarding a strength to TIA, which had received the same certifications. TIA MJAR at 24–26.

TIA's argument lacks merit because it listed the certifications which it claims were overlooked (such as [***]) in its Factor 1, not in its Factor 4, proposal. See AR Tab 160 at 25950–51 (list of certifications and accreditations); TIA MJAR at 26. In the other instances where the agency assigned a strength for these certifications, the offerors had listed their certifications in their Factor 4 proposals. See, e.g., AR Tab 65d at 5022 (DirectViz small business Factor 4 evaluation); AR Tab 139 at 16113 (DirectViz small business proposal); AR Tab 65d at 5549 (Sealing Technologies, Inc. small business Factor 4 evaluation); AR Tab 154 at 23912 (Sealing Technologies, Inc. small business proposal). TIA is therefore not similarly situated to these offerors.

TIA argues that it was nonetheless treated unfairly. It points out that although separate TEBs were assigned to evaluate each factor, subsequent review boards had access to all volumes and could have therefore considered the certifications to assign strengths for any factor. TIA MJAR at 26–27. But the approach TIA argues the agency should have taken would be contrary to the terms of the Solicitation. The Solicitation expressly stated that "[t]o the greatest extent

possible, each volume shall be written on a <u>stand-alone</u> basis so that its contents may be evaluated with a minimum of cross-referencing to other volumes of the proposal." AR Tab 5 at 371 (emphasis supplied). Further, it stated that "[i]information required for proposal evaluation which is not found in its designated volume <u>will be assumed to have been omitted</u>." <u>Id.</u> (emphasis supplied). Thus, TIA's claim that it was entitled to be assigned a strength under Factor 4 based on information it submitted for consideration in its Factor 1 proposal lacks merit.

### B.   DirectViz Solutions, LLC (Case No. 19-1162)

#### 1.   The Agency's Evaluation and Award Decision

DirectViz Solutions, LLC ("DVS") submitted its proposal on April 4, 2017. AR Tab 139. The agency assigned DVS six strengths and three weaknesses under Factor 1. AR Tab 65d at 5014–17. For Factor 2, the agency deemed two out of three of DVS's references not relevant. <u>Id.</u> at 5018. It found relevant the third reference and assigned it a quality rating of "Exceptional." <u>Id.</u> The agency assigned DVS four strengths and one weakness under Problem Statement No. 3, <u>id.</u> at 5019–20, and one strength, one weakness, and one significant weakness for Problem Statement No. 4, <u>id.</u> at 5020–21. Finally, under Factor 4, DVS earned five strengths and was assigned no weaknesses. <u>Id.</u> at 5022–23.

The agency assigned DVS's proposal the following adjectival ratings:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Satisfactory | Outstanding | Marginal | Good |

AR Tab 65 at 4659.65 (SSA ratification of SSEB recommendation); AR Tab 65d at 5013–24. DVS's evaluated price ranked [***]. AR Tab 65d at 5024.

The SSA observed that DVS's six strengths under the Innovation factor "are attractive and while the risk of unsuccessful performance was low, based on the rating, the technical advantages were not superior to other proposals." <u>Id.</u> at 4659.67. He considered the "technical advantages and disadvantages" that came with DVS's proposed price. <u>Id.</u> He concluded that because the proposal was "not amongst the most highly rated or the lowest priced" it did "not represent a best value to the Government," and "d[id] not merit selection for an award." <u>Id.</u> at 4659.68.

#### 2.   The Debriefing

On July 9, 2019, DISA notified DVS that it had not been selected for an award and it supplied DVS with a list of the twenty-three successful offerors. AR Tab 69 at 8667–69. DVS requested a post-award debriefing the same day. AR Tab 73 at 8726.

The next day, on July 10, 2019, the agency sent DVS a document that included a table of the successful offerors with the adjectival ratings assigned them for each technical factor, along with their prices. AR Tab 73a at 8731–33. In addition, the document included a summary of the

evaluation process the agency followed. Id. On July 12, DVS sent the agency a follow-up email asking questions in response to the initial debrief email to which the CO responded on July 22. AR Tab 100 at 8990 (email from CO to DVS).

### 3.     DVS's Protest

#### a.     Violation of 10 U.S.C. § 2305

DVS first contends that the agency's debriefing process did not comport with the requirements of 10 U.S.C. § 2305(b). Mem. in Supp. of Pl.'s Mot. for J. on the Admin. R. ("DVS MJAR") at 15, ECF No. 84. That statute requires that an unsuccessful offeror who makes a timely request for a debriefing be provided information regarding "the basis for the selection decision and contract award." 10 U.S.C. § 2305(b)(5)(A). As pertinent to the present procurement, the debriefing must include, "at a minimum": "the agency's evaluation of the significant weak or deficient factors in the offeror's offer"; "the overall evaluated cost and technical rating of the offer of the contractor awarded the contract and the overall evaluated cost and technical rating of the offer of the debriefed offeror"; "the overall ranking of all offers"; "a summary of the rationale for the award"; "reasonable responses to relevant questions posed by the debriefed offeror as to whether source selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency"; and "an opportunity for a disappointed offeror to submit, within two business days after receiving a post-award debriefing, additional questions related to the debriefing." 10 U.S.C. § 2305(b)(5)(B).

DVS argues that—in violation of these statutory requirements—the agency did not provide it with "the overall ranking of all offers." DVS MJAR at 15. It notes that "[t]he purpose of an overall ranking is to demonstrate an Agency's reasoning behind its award decisions." Id. DVS argues that "[u]nless [it] can review the overall rankings following DISA's award decision, it will have no assurance that it has identified all arbitrary and capricious actions, abuses of discretion, and failures to observe procedures required by law relevant to DISA's agency actions." Id. at 16. It also contends that "the requirement that an overall ranking be formulated implicates agency compliance and enforces discipline during the procurement process." Id.

The government argues that § 2305(b)(5)(B)(iii) "does no more than require agencies to provide an offeror's overall ranking if the ranking exists" and that "[i]t does not require the agency to create a ranking in the first instance." Def.'s Cross-Mot. for J. upon the Admin. R. and Consolidated Resp. in Opp'n to Pls.' Mots. for J. upon the Admin. R. ("Gov't MJAR") at 37–38, ECF No. 123. And even if DVS did not receive information to which it was entitled during the debriefing, the government argues, it has not shown that it suffered prejudice as a result. Id. at 35. The Court agrees with the government.

First, the government's interpretation of the statute is supported by its language and its purposes. Section 2305(b)(5)(B)(iii) requires the agency to provide "the overall ranking of all offers," not "an overall ranking of all offers." Use of the definite article "the" rather than the indefinite article "an" indicates to the Court that the "overall ranking" referenced in the statute refers to a ranking that has already been performed, not a ranking performed for purposes of a debriefing. Moreover, if the agency did not rank all of the proposals as part of its evaluation

process, then performing such a ranking after the fact would not serve the statutory purpose of shedding light on the reasoning behind the agency's award decision.

In this case, there is nothing in the administrative record which reflects that the agency created a ranked list of all of the proposals it received.[5] And while failing to perform a comprehensive ranking of offerors may in some circumstances reflect a lack of discipline (as is suggested by DVS), DVS does not contend that the agency abused its discretion or acted unreasonably when it did not perform a comprehensive ranking of all of the offerors here.

In any event, even assuming that the agency violated a requirement that it supply DVS with an overall ranking of all offerors, DVS has failed to show that the purported error was prejudicial—i.e. that "there was a substantial chance that it would have received [an] award but for the error." Bannum, 404 F.3d at 1355 (internal citations omitted). In fact, when DVS posed questions to the agency after receiving its debriefing documents, it did not mention the ranking of offerors that it now claims the agency was required to provide to it. That suggests to the Court that DVS itself did not consider the information particularly critical to its understanding of the basis for the agency's decision not to award it a contract. Additionally, as part of the debriefing, the agency provided DVS with a table that listed the technical ratings and prices of all of the successful offerors, which would have enabled it to perform a comparison between those ratings and prices and its own. AR Tab 73a at 8732. And finally, it has since been provided a copy of the administrative record, including the SSDD which contains extensive information about "the basis for the selection decision and contract award," which is what 10 U.S.C. § 2305(b)(5)(A) requires the agency to "furnish" upon timely request by offerors. The absence of a document that ranks all of the offerors has not prevented DVS from pressing multiple allegations of error in this protest.

In short, the Court does not agree that the agency failed to supply DVS with information to which it was statutorily entitled. But even if a violation occurred, DVS has not shown that it suffered any resulting prejudice. Therefore, this protest ground lacks merit.

---

[5] The memorandum of the SSAC indicates that the agency began its selection process by eliminating the forty proposals that received an "Unacceptable" rating in either Factor 1 or Factor 3. AR Tab 65e at 5784. It then looked at the twenty offerors (of the remaining fifty-nine) that had been rated "Outstanding" on Factor 1 and reviewed them from the highest to the lowest technically rated. Id. at 5785. It made awards to eighteen of these offerors upon consideration of their technical ratings and prices. Id. at 5872. It next moved on to review in order of their overall technical merits the twenty-five proposals that had at least a "Good" rating on Factor 1, and then those that had received at least an "Acceptable" rating on Factor 1. Id. at 5826–73. The administrative record also includes a table prepared by the CO which listed the SSAC's thirty highest rated proposals, along with their prices and technical ratings. DVS is listed as number thirty in technical ratings. AR Tab 54 at 3432–33.

### b.  Alleged Errors in Evaluation under the Innovation Factor

In its complaint and MJAR, DVS presents several challenges to the agency's evaluation of its proposal under the Innovation Factor. For the reasons set forth below, the Court concludes that each of those challenges lack merit.

### i.  Use of unstated criteria to evaluate "Knowledge Management"

Pursuant to section L.4.2.3.2 of the Solicitation's instructions, offerors were required to provide specified information regarding the topic of their "Investment in Innovation" that would be used to evaluate their proposals under the Innovation factor. AR Tab 5 at 377. As pertinent here, under the subtopic "Knowledge Management," the instructions required offerors to describe "[w]hat . . . the company's Knowledge Management methodology look[s] like," as well as "[w]hat . . . the company's 'architecture' look[s] like and what types of resources are available in the company architecture." Id.

In compliance with this instruction, DVS's proposal includes a [***]. AR Tab 139 at 15970. With respect to the instruction to set forth the "types of resources . . . available in the company architecture," AR Tab 5 at 377, DVS stated that it [***], AR Tab 139 at 15970. It also identified the [***]. Id.

The agency assigned DVS a weakness under the Knowledge Management subtopic. It reasoned as follows:

> The Offeror provides a very brief description of their KM methodology and their KM architecture – [***] not a knowledge management architecture with the maturity to manage the strategy, planning, execution, and improvement processes that the Offeror includes in their methodology. This is a flaw in the Offeror's proposal that increases the risk of unsuccessful contract performance because SETI stakeholders require a mature and proven knowledge management strategy, architecture, and resources to provide an oversight management framework for their complex IT developmental efforts.

AR Tab 65d at 5016.

DVS contends that the agency's assignment of a weakness to its Factor 1 proposal on these bases violated the "fundamental principle of procurement law that an agency may only evaluate offerors in accordance with the evaluation criteria stated in the Solicitation." DVS MJAR at 16 (citing FAR 15.305(a)). It observes that the "Solicitation does not prescribe any preferences as to the types of KM resources that should be utilized[, n]or does [it] indicate that offerors' proposals will be downgraded for use of any particular KM resources, [***]." Id. at 17. Nonetheless, according to DVS, the agency treated its proposal [***] as "essentially disqualifying." Id. at 16–17; see also id. at 17 (complaining that "DISA failed to put DVS on notice that a proposal that incorporates [***] would be evaluated negatively").

The Court is not persuaded that DVS's proposal was "downgraded" much less "essentially disqualified" simply because it proposed the use of a particular technology

product—[***]. Id. at 16–17. The agency stated that it assigned the proposal a weakness because it provided only a "very brief description of [DVS's] KM methodology and . . . KM architecture," and because it concluded that the technology DVS identified—[***]—was not "a knowledge management architecture with the maturity to manage the strategy, planning, execution, and improvement processes that the Offeror includes in their methodology." AR Tab 65d at 5016.

DVS points out that the agency assigned awardee DHPC Technologies, Inc. ("DHPC"), a strength based on its responses to the Knowledge Management subtopic where it proposed a [***]. Id. at 18 (citing AR Tab 65 at 4659.31). DVS expresses skepticism about "the sincerity of DISA's concern over DVS's proposed KM solution" given this assignment of a strength to DHPC. See id. But the assignment of a strength to another offeror that proposed the [***], does not raise questions about DISA's "sincerity." Id. Instead, it confirms that it was not DVS's proposed [***] in and of itself that was of concern to the IEB. The Court therefore rejects DVS's argument that the agency applied an unstated evaluation criterion to its proposal.

## ii.   Failure to consider other knowledge management capabilities contained in the proposal

In addition to its argument that the agency applied unstated evaluation criteria to the evaluation of DVS's knowledge management proposal, DVS also contends that the agency arbitrarily ignored that it had "proposed other KM solutions in its proposal as alternatives or supplements to [***]." Id. at 19. DVS asserts that its proposal "indicates that it utilizes [***]." Id. (citing AR Tab 139 at 15970). It also contends that its proposal [***]. Id. (citing AR Tab 139 at 15969). Finally, in its Reply, DVS cites language in its proposal which states that its [***]. DVS Reply Mem. In Support of Pl.'s Mot. J. on the Admin. R. ("DVS Reply") at 15 (quoting AR Tab 139 at 15969).

The Court lacks the competence not to mention the authority to second guess the agency regarding the relevance of these other technologies to the Knowledge Management subtopic. See Benchmade Knife Co. v. United States, 79 Fed. Cl. 731, 740 (2007) (observing that the court "simply is not equipped to determine whether the differences between the [combat] knives articulated by Benchmade rise to the level of significant differences, thus rendering the agency's determination unreasonable" and that "[a]gencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment"). Further, it finds it noteworthy that DVS itself did not reference these additional technologies in explaining "[w]hat . . . [DVS's] Knowledge Management methodology look[s] like," or "[w]hat . . . the company's 'architecture' look[s] like and what types of resources are available in [its] architecture." AR Tab 5 at 377. Instead, the references to the other technologies are included in [***]. AR Tab 139 at 15968–69.

The Court concludes that it was not irrational or improper for the agency to assign a weakness to DVS's proposal where it did not identify these other resources as part of its knowledge management methodology or architecture. DVS's protest on this basis is therefore rejected.

### iii.        Unequal treatment

In conjunction with the evaluation of Factor 1, the Solicitation required offerors to provide information in their proposals concerning their "Corporate Philosophy/Culture on Innovation." AR Tab 5 at 376. As pertinent to this protest, offerors were to "describe the company's culture regarding employee[s'] pursuit of Innovation and how they are rewarded for doing so." Id. at 377. Offerors were also asked to provide "an example of when the company failed at attempting to deliver Innovation and what they learned from that failure" as well as "[w]hat, if any consequences there were to the employee." Id.

The agency assigned a weakness to DVS's proposal regarding these requirements, finding that it did not "provide adequate information on when th[e] company failed at attempting to deliver Innovation and what, if any, consequences there would be to employees who pursued an innovative initiative and experienced failure." AR Tab 65d at 5016. The agency explained that the example of failure that DVS had provided involved "an operational oversight failure by the[] Government client, not a company failure in attempting to deliver innovation." Id.; see also AR Tab 139 at 15964 (DVS proposal providing example in which its government client "failed to define a requirement"). The flaw in DVS's proposal in this regard, the agency concluded, "increases the risk of failure to be innovative because the Offeror does not demonstrate it understands there is value in failure and can apply the lessons learned from innovation failure towards future innovation success." AR Tab 65d at 5016.

DVS does not disagree with the agency's conclusion that its proposal was not compliant with the instructions because it did not identify and discuss one of its own failures to innovate. Nor does it contend that it was irrational for the agency to determine that this shortcoming merited the assignment of a weakness. Rather, it argues that it is a victim of "unequal treatment" because the agency "failed to assign weaknesses" and even "made awards" to other offerors whom it alleges also "failed to discuss past failures to innovate." DVS MJAR at 38. These offerors, it asserts, included Integrated Systems, Inc., Applied Systems Engineering Joint Venture, ValidaTek, Inc., and DHPC Technologies. Id.

Contrary to DVS's assertions, however, each of the proposals it cites did in fact include specific examples of past failures by the offerors. The proposal of Integrated Systems, for example, discussed [***]. AR Tab 146 at 20098. [***] Id. at 20098–99. Applied Systems Engineering's proposal also supplied a specific example of failure [***]. AR Tab 130 at 12351 (describing a [***]). The proposal also addressed in some depth [***]. Id. ValidaTek's proposal similarly included examples of failures it experienced along the way in [***]. AR Tab 163 at 27252. And DHPC's proposal also included specific examples of failures it had experienced [***]. AR Tab 138 at 15319.

In its reply brief, DVS repeats its inaccurate assertion that the proposal of Applied Systems did not include any examples of failure. DVS Reply at 16. And while retreating from its original assertion that the other cited proposals included no examples of failure, it now alleges that those proposals "provide only vague anecdotes with close to no detail and hardly any exposition on the lessons learned from failure, as required by the Solicitation." Id. The Court does not agree with this characterization of the other proposals. But in any event, as explained above, to establish disparate treatment, DVS must show that the other proposals were

"substantively indistinguishable" from its own. See Office Design Grp., 951 F.3d at 1373. For the reasons set forth above, it has failed to make this showing. Therefore, DVS's allegations of disparate treatment lack merit.

### c.        Alleged Errors in Evaluation of Past Performance

As noted earlier, DVS submitted three past performance references, two of which the agency deemed not relevant. AR Tab 65d at 5018. DVS claims that these determinations were at odds with the requirements of the Solicitation and were based on unstated evaluation criteria. DVS MJAR at 20.

At the outset, the Court notes the determination of whether a particular example of past performance is relevant involves an exercise of discretion that lies particularly within the expertise of the procuring agency. The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that the offeror will successfully perform and meet the needs of the agency on the contract at issue. See Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 785 (2011) (quoting Al Andalus Gen. Contracts Co. v. United States, 86 Fed. Cl. 252, 264 (2009)) (stating that it is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference'"); Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. 42, 51 (2011) (finding that when evaluating an offeror's past performance, "FAR 15.305(a)(2) affords agencies considerable discretion in deciding what data is most relevant"); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 396 (2011) (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 505 (2005)) ("When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'"); Todd Constr., L.P. v. United States, 88 Fed. Cl. 235, 247 (2009), aff'd, 656 F.3d 1306 (Fed. Cir. 2011) ("[T]he relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'") (internal citations omitted). Therefore, to justify an interference with the agency's exercise of discretion regarding the relevance of an offeror's past performance, the protester must demonstrate that the agency determination regarding relevance "lacked any rational basis." Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 117 (2003), appeal dismissed, 89 Fed. Appx. 741 (Fed. Cir. 2004) (emphasis and modification in original).

DVS argues that "[h]ad the Agency correctly evaluated References 1 and 2 under the clearly stated evaluation criteria," these references "would have received 'Very Relevant' ratings and DVS's Past Performance proposal would have compelled a 'Substantial Confidence' overall rating and [it] likely would have been selected for award." DVS MJAR at 25. The Court is not persuaded by this contention.

Reference 1 involved DVS's work as [***]. AR Tab 139 at 15985. The PPEB deemed this work not relevant because, although "[s]ome task areas [identified in the SETI performance work statement] were addressed," the referenced contract concerned "an operations and maintenance requirement" and it demonstrated "little complexity and innovation beyond standard problem solving." AR Tab 46 at 1895 (agency's past performance rating and narrative).

DVS contends that—contrary to the PPEB's views—the work it performed on Reference 1 "did require the complexity, innovation or scope to be relevant." DVS Reply at 12. It observes that its proposal "list[ed] a variety of solutions that it delivered and implemented during performance including [***]." Id. Further, DVS states, it "also [***]." Id. (citing Tab 139 at 15983). DVS argues that it therefore "'did more than just solve problems'" in performing the work on the Reference 1 contract. It also "provided, inter alia, [***]." Id. (citing Tab 139 at 15988, 15990).

DVS poses a similar challenge to the PPEB's conclusion that Reference 2, which cited its work under the [***] was not relevant. AR Tab 46 at 1896. The PPEB observed that this contract involved "a migration and support effort," and that "[n]o innovation or description of complexities [was] provided." Id. at 1897. It characterized the referenced contract as involving "standard operations and maintenance work." Id. Therefore, the PPEB reasoned, "[l]ittle or none of the scope and magnitude of effort and complexities this solicitation requires is demonstrated." Id.

As it did with respect to Reference 1, DVS contends that Reference 2 also should have been found relevant because, contrary to the agency's views, the reference revealed its "ability to perform the SETI work." DVS Reply at 13. Again, as it did with Reference 1, DVS supplies language from its past performance proposal describing its technical accomplishments under the referenced contract, and argues that those accomplishments belie the agency's finding that Reference 2 was not relevant. Id.

DVS has not persuaded the Court that the agency's conclusions regarding References 1 and 2 lacked any rational basis. The PPEB reviewed DVS's questionnaire and explained why it found that only one of the three examples provided was relevant. DVS disagrees with the agency's judgment that the prior work reflected in the References is not sufficiently similar to the SETI contract in terms of its scope, magnitude of effort, and complexity. But this Court has no legal basis for choosing DVS's opinion over that of the PPEB. In cases that involve the application of judgment in a highly technical area, the Court's "main task" instead is to ensure that the agency "examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The Court concludes that the agency passed that threshold in this case.

The Court also finds no merit to DVS's contention that the agency ignored its stated evaluation criteria in assessing the relevance of References 1 and 2. DVS cites the Solicitation's instructions for providing information about past performance which state that "[s]imilar Contracts may include projects in a variety of sizes, a variety of disciplines, varying degrees of technical complexity" and that "[s]imilar projects may include," among others, "[e]fforts in excess of $3M for [the] restricted category or in excess of $15M for [the] unrestricted category (if less than these thresholds, justify relevancy to SETI)." AR Tab 5 at 379; see DVS MJAR at 23.

DVS observes that both References 1 and 2 involved efforts well in excess of the three-million-dollar threshold. Therefore, it argues, the agency determination that they were not relevant was inconsistent with the instructions in the Solicitation. This argument lacks merit.

While the Instructions stated that similar projects "may" include efforts that exceeded the dollar thresholds, they do not provide that exceeding the dollar thresholds is sufficient in and of itself to establish the relevancy of a past performance reference. To the contrary, offerors were advised that "[s]imilar projects" that that they identified "should demonstrate as many of the project types included in the PWS (either individually or in combination thereof) as possible." AR Tab 5 at 379. This instruction makes it clear that the determination of relevance would be based on multiple factors, not just the value of the referenced contract.

Finally, DVS also argues that "even if [its] Past Performance References # 1 and # 2 were indeed 'Not Relevant,' DISA provided no reasoning as to why DVS was assigned a Performance Confidence Assessment Rating of 'Satisfactory Confidence,' when Reference # 3 was rated as 'Relevant' and 'Exceptional.'" DVS MJAR at 24. The Court believes the agency's reasoning is self-evident. The Solicitation provides that a "Satisfactory Confidence" rating is appropriate when "[b]ased on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort." AR Tab 5 at 390. A "Substantial Confidence" rating requires that the agency have "a high expectation that the Offeror will successfully perform the required effort." Id. Here, because DVS supplied only one relevant reference (albeit a reference that had a high-quality rating), the agency concluded that the one reference gave them a reasonable expectation that DVS could successfully perform on the SETI contract, but not necessarily a "high" one. Id.

In short, DVS has not shown that the agency's assessment of the relevance of its past performance references lacked a rational basis or was inconsistent with the Solicitation's criteria. Its protest on these bases therefore lacks merit.

### d.   Inconsistency of Adjectival Ratings

DVS contends that the agency was "remarkably inconsistent" in its assignment of adjectival ratings. DVS MJAR at 25. This contention is not supported by the portions of the record upon which DVS relies.

First, the Court is not persuaded by DVS's argument that the agency's assignment of adjectival ratings to its proposal for Factors 3 and 4 was "facially irrational." Id. It so contends because, on the one hand, the PSEB assigned the proposal an "Outstanding" rating under Factor 3, Problem Statement No. 3, and identified four strengths and one weakness, id., but on the other, the SBEB assigned it "Good" rating under Factor 4 (Small Business Plan) where the balance of strengths (five) against weaknesses (none) was even more favorable. Id.

DVS's argument is unpersuasive for several reasons. First, separate technical evaluation boards evaluated each of the technical factors. Even if there were inconsistencies it would be neither surprising nor evidence of irrationality, given that distinguishing a "Good" proposal from an "Outstanding" one involves at least some subjective judgment. As GAO has observed, "it is not unusual for different evaluators, or groups of evaluators, to reach different conclusions and assign different scores or ratings when evaluating proposals, since both objective and subjective

judgments are involved." Wellpoint Military Care Corp., B-415222.5, 2019 CPD ¶ 168 (Comp. Gen. May 2, 2019).[6]

In addition, there are material differences between the criteria for assigning adjectival ratings under Factors 3 and 4. Specifically, the adjectival rating assigned under Factor 3, Problem Statement No. 3 is based in part upon a balance between the number of strengths and weaknesses in a proposal. See AR Tab 5 at 391. To secure an "Outstanding" rating under Factor 3 the proposal's strengths must "far outweigh any weaknesses." Id. On the other hand, a "Good" rating for Factor 4 is merited where the proposal indicates "a thorough approach and understanding of the small business objectives," while an "Outstanding" rating requires an "exceptional approach and understanding." Id. The balance between a proposal's assigned strengths and weaknesses is not mentioned. Id.

The other alleged inconsistency DVS identifies—involving the evaluation of Problem Statement No. 4—is similarly illusory. See DVS MJAR at 26. DVS was assigned an overall rating of "Marginal" for Problem Statement No. 4 where the agency assessed one strength, one weakness, and one significant weakness. Awardee SuprTek also received a "Marginal" rating for Problem Statement No. 4, where it was not assessed any strengths and was assigned two significant weaknesses. Id.

These results are also consistent with the evaluation criteria and do not evince any irrationality. The Solicitation expressly provides that a "Marginal" rating would be assigned under this factor if, among other things, a proposal "has one or more weaknesses which are not offset by strengths." AR Tab 5 at 391. Both DVS's proposal and that of SuprTek meet this criterion.

In short, there is nothing in the Solicitation requiring that the same adjectival ratings be assigned across the technical factors based on an accounting of the number of strengths and weaknesses assigned under each factor. To the contrary, the evaluation criteria vary depending on the technical factor being assessed. And the evaluators themselves are not the same. Therefore, DVS's protest alleging the irrational assignment of adjectival ratings must be rejected.

### e.    Price Reasonableness

DVS contends that the agency's price reasonableness analysis was arbitrary and capricious and violated the applicable provisions of the FAR. DVS MJAR at 27. The Court does not agree.

"The purpose of a price reasonableness analysis is to prevent the Government from paying too high a price for a contract." See, e.g., Patriot Taxiway Indus. V. United States, 98 Fed. Cl. 575, 587 (2011) (citing Ceres Envtl. Servs. V. United States, 97 Fed. Cl. 277, 303 n.15 (2011)). FAR 15.404-1(b)(2) provides that agencies may "use various price analysis techniques" to ascertain price reasonableness and sets forth a non-exhaustive list of such techniques. And the

---

[6] GAO decisions are not binding on the Court but may be treated as persuasive authority in light of GAO's expertise in the bid protest arena. See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011).

Solicitation provided that "[t]he Offeror's price proposal (fully burdened fixed price labor rates) will be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete." AR Tab 5 at 393.

Performing a comparison of all of the offerors' proposed prices is one of the two "preferred" techniques identified in the FAR. See FAR 15.404-1(b)(3). The regulation further provides, moreover, that "[n]ormally, adequate price competition establishes a fair and reasonable price." FAR 15.404-1(b)(2)(i). It is undisputed that in this case, the agency performed a comparison of the offerors' prices to each other and also to the independent government estimate, both of which are techniques described in the FAR.

DVS argues nonetheless that the agency's price reasonableness analysis was not FAR-compliant. DVS MJAR at 27–28. First, DVS contends, "the mere presence of competition and the mere receipt of proposals does not per se establish reasonable prices." Id. at 28. This is a straw man. The agency did not base its reasonableness determination solely on the existence of competition. Rather, as DVS itself acknowledges in its MJAR, the agency "conducted an in depth price reasonableness evaluation." Id. at 27.

As the administrative record reveals, the PEB "reviewed all prices for all of the offerors for completeness and to ensure that all prices were calculated correctly." AR Tab 65c at 4678 (CO's memorandum for the record); see also AR Tab 51 (PEB report). Next, it evaluated each proposal for unbalanced pricing. AR Tab 65c at 4678. The PEB then compared the total proposed prices to each other and to the IGCE. Id. It identified the average total price of the ninety-nine offerors ($193,870,790), the highest proposed total price ($381,206,594), the lowest proposed total price ($99,924,321), and the median total price ($187,899,682). Id. It observed that the total proposed prices of seventy-nine offerors were lower than the IGCE and twenty were higher. Id.

The PEB also compared the individual labor rates against each other, using a 2.5 standard deviation rate to identify a maximum rate for each of the ninety-six labor categories. Id. at 4679. It provided the CO with a spreadsheet that identified the twenty offerors who proposed at least one labor rate that exceeded the maximum. Id. It also identified the number of labor rates that exceeded the maximum for each of the twenty offerors. Id.

The agency therefore did not rely upon the mere presence of competition to conduct its analysis. It performed precisely the type of comparison of the proposals that the FAR recommends as a preferred technique. Moreover, the agency did not "ignore[] the results" of its own analysis or "ma[k]e awards to offerors that failed [its] price reasonableness test," as DVS claims. DVS MJAR at 27. To the contrary, the CO acknowledged that there was a "large variance among the total proposed prices and the individual labor rates." AR Tab 65c at 4679. But the variance, he noted, "was not unanticipated" and, in his view, "did not cause a concern that the government would pay an unreasonably high price." Id. He explained that the Solicitation had "introduced a great amount of risk of paying a high, but not unreasonable, price, based upon the need to obtain a range of potentially innovative solutions." Id. The PWS, he further elucidated, "described the complex and unknown nature of the work that would be executed for worldwide missions" as well as the difficulty of "fully anticipating how technical requirements and individual programs will evolve over the life of the Contract vehicle." Id.

Given these and other considerations set forth in his memorandum, the CO concluded that the large variance between the highest and lowest total proposed prices and individual labor rates did not, in and of themselves, establish that any particular prices were not reasonable or that the highest priced proposals were unreasonably high. Id. He reiterated that the Solicitation "included significant risk for any offeror," explaining that "[o]fferors had to make business decisions on how to strategize their pricing which led to the wide dispersion of prices, and the Government accepted the potential risk of paying higher prices, but not unreasonable prices, for higher quality solutions." Id. at 4680. Further, "[w]ith the variety of requirements that can and will be executed under the SETI, and the risk of complexities, unknowns, time, location, and magnitude," the Solicitation made clear "that non-cost factors, when combined, were significantly more important than price for this contract and that it may have to pay more for and was willing to pay more for higher technically rated proposals." Id. He concluded that "the risk of paying too much for requirements is low compared to the needs of the Government, particularly given the mitigating factor that there will be competition to refine prices at the [task] order level." Id.

Finally, the CO noted that a number of offerors had proposed individual labor rates that exceeded the maximum (based on the 2.5 standard deviations). Id. Nonetheless he concluded that "if the SSA would be willing to pay those higher rates for higher technically rated offerors, the SSA should have the option to do so," and should document its reasoning in the SSDD "with the rationale to include a risk analysis for paying higher prices for a higher rated proposal." Id. at 4681.

Despite the CO's extensive explanation of his conclusions, DVS argues that his underlying rationale wrongly "confuses price reasonableness with a best value trade off." DVS MJAR at 29. It notes that "[p]rice reasonableness is not concerned with whether the government may be willing to pay higher rates for higher technically-rated offerors—that is the concern of a best value trade off." Id. "Rather," it says, "price reasonableness is concerned with whether the prices proposed by the offeror are too high for the services proposed"; "in other words . . . whether the prices exceed fair market rates or are otherwise unfair to the government." Id. at 29–30.

The Court finds this argument unpersuasive. The CO did not suggest that the test of price reasonableness was how much the agency was willing to pay. To the contrary, after conducting his in-depth analysis of the offerors' prices relative to the IGCE and each other, he left room for the agency to determine whether the prices proposed were reasonable in consideration of the particular attributes of each offeror's proposal. And in the end—while DVS attacks the agency's analysis—it is unable to identify a successful offeror whose price proposal was irrationally found reasonable. At best, it notes that [***]. DVS MJAR at 28. But there were ninety-six different labor categories for which rates had to be proposed and other offerors exceeded the maximum labor rates in far more categories. See AR Tab 65c at 4679 (listing offerors who exceeded labor rates in 122, 58, 57, 52, and 41 labor categories).[7] Further [***] received an "Outstanding" rating for innovation, but its total price ([***]) was only slightly above the average total price

---

[7] None of the offerors referenced in the parenthetical received contract awards.

($193,870,790) of the ninety-nine offerors who remained in the competition following the initial cut. See AR Tab 65d at 5645.

Similarly, DVS complains that awardees [***], proposed prices that were "well over" the IGCE of $221 million and, as a result, they "could not be reasonably considered to be fair and reasonable." DVS MJAR at 30. In its reply, DVS also cites the prices of RedTeam Engineering and ValidaTek. DVS Reply at 3. But all of these offerors' proposals ranged from $221 to $240 million which means that they were all less than ten percent above the IGCE. Id. Further, each of these proposals received "Outstanding" ratings for Innovation. AR Tab 65 at 4659.6; AR Tab 65d at 5488. Therefore, DVS has not established that the agency acted irrationally when it found that these offerors' price proposals were not unreasonable.

In short, the agency conducted a reasonable price analysis in compliance with the FAR. It compared the offerors' total prices as well as their labor rates. The CO explained why—in light of the particular characteristics of this procurement—the variations identified in the price comparison did not, in and of themselves, create a risk that the government would pay too much for the services. That is sufficient to establish that its price reasonableness analysis was neither arbitrary and capricious, nor contrary to law. See Technatomy Corp. v. United States, 144 Fed. Cl. 388, 390 (2019) (holding that "DISA conducted a meaningful price reasonableness analysis, in compliance with 48 C.F.R. § 15.404-1(b)(2), by comparing the prices of offerors to each other's, to the average price, to the independent government cost estimate, and to the prices under other contracts, and by explaining that variations were due to differing risk preferences and technical approaches"); cf. Multimax, Inc., B-298249.6, at 8 (Comp. Gen. Oct. 24, 2006) (finding price reasonableness analysis deficient where there was "no indication that the agency ever reviewed the results of [its] formula to assure that the prices at the extreme end of the ranges reflected reasonable pricing" but "rather . . . mechanistically applied the formula and accepted the results without further analysis").

### f.    The Agency's Unbalanced Pricing Analysis

The Solicitation provided that the agency would review the offerors' proposals for unbalanced pricing, which "exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated." FAR 15.404-1(g)(1). The mere existence of mathematical imbalance in pricing does not necessarily require the rejection of a proposal. See Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. 635, 652 (2017) (citing Al Ghanim Combined Grp. V. United States, 56 Fed. Cl. 502, 515 n.17 (2003)) (distinguishing between mathematically and materially unbalanced proposals). Rather, where the agency's analysis indicates that unbalanced pricing exists, the CO must: 1) "[c]onsider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision"; and 2) "[c]onsider whether award of the contract will result in paying unreasonably high prices for contract performance." FAR 15.404-1(g)(2).

DVS contends that the agency's unbalanced pricing analysis with respect to the proposals of awardees Riverside Engineering Joint Venture and DHPC was arbitrary, capricious, and contrary to law. DVS MJAR at 31. The Court disagrees.

For awardee DHPC, the PEB identified potentially unbalanced pricing within the Human Factors Engineer labor category because the fully loaded rate for the Junior Engineer was higher than the rate for the Senior Engineer. See AR Tab 51 at 3320–21. The PEB similarly identified potential unbalanced pricing in Riverside's proposal within the Systems Engineer labor category, where the rate for the Senior Engineer was lower than the rates for both the Junior and Mid-Level engineers. Id. at 3309.

But the CO found that these examples of unbalanced pricing did not create an unacceptable level of risk. Id. at 3309, 3320–21. First, the CO expressed doubt as to whether there was actually an imbalance between the fully loaded rates for Junior and Senior engineers under Riverside's proposal. Id. at 3309. He suggested that the apparent imbalance may have been the result of certain accounting methods. Id. And in any event, he found, to the extent that the discrepant labor rates in either Riverside or DHPC's proposals represented unbalanced pricing, they involved only one of ninety-six applicable individual labor categories and did not "render the entire proposal unbalanced." AR Tab 52a at 3386, 3387 (memorandum for the record on fair and reasonable price). Further, the CO concluded that "the unbalanced pricing for one labor category set would not pose an unacceptable performance risk, and is unlikely to result in the Government paying an unreasonably high price." Id. at 3387.

DVS asserts that "[o]verall, [the agency's] assessment of risk, or lack thereof, with respect to [DHPC] and Riverside's unbalanced pricing was woefully inadequate." DVS MJAR at 33. The Court disagrees. The agency acknowledged the instance of apparent unbalanced pricing in the labor rates in each of the two proposals and found that these instances did not establish that the proposals overall were unbalanced. It also explained why the imbalances did not create the risks of poor performance or unreasonably high prices against which an unbalanced pricing analysis guards. It found any risks presented acceptable because for each proposal there was an imbalance in only one of ninety-six labor categories.

Further explanation was not required. DVS's challenge based on unbalanced pricing lacks merit.

g.      **The Agency's Best Value Tradeoff Analysis and Source Selection Decision**

DVS next argues that the agency "failed to conduct a best-value tradeoff analysis as required by the Solicitation." DVS MJAR at 33. It contends that the agency did not "meaningfully" consider price, but instead "mechanically made award to the offerors whose proposals exhibited, in descending order, the best combination of adjectival ratings under the non-price factors." Id. at 34, 35. It similarly claims that the agency improperly placed "rigid reliance [on] adjectival ratings, without any engagement with the relative merits behind those ratings or any consideration of the price differences." DVS Reply at 8. In particular, DVS argues, its overall non-price technical ratings were not significantly different from those of several awardees whose price proposals were higher.

DVS's assertion that the agency did not engage in a reasonable best value tradeoff process is not supported by the record. For example, DVS cites the proposal of awardee Synaptek. DVS MJAR at 34. DVS's total price was [***] than Synaptek's. Id. And DVS

received the same adjectival ratings as Synaptek, except that Synaptek was assigned a "Good" rating for Problem Statement No. 4, while DVS was assigned a "Marginal" rating. Id. DVS argues that it was unreasonable for the agency to [***] for what DVS characterizes as a "modest difference in technical ratings." Id. DVS also objects to the agency's decision to make awards to three offerors that received "Neutral" past performance ratings, two of which it paid "substantial price premium[s]," in one case more than $50 million, or thirty-one percent. Id. at 36. It contends that "[p]aying this sort of premium for an entirely unproven contractor is irrational." Id.

The Court rejects DVS's reliance upon these examples as relevant comparators. The technical rating for Synaptek's proposal, for example, was materially better than DVS's rating because DVS received only a "Marginal" rating for Problem Statement No. 4, while Synaptek's rating of "Good" was two levels higher. And Synaptek's [***], which does not strike the Court as a facially irrational "premium" for the agency to decide to pay over the life of a ten-year contract for a technically superior proposal. Id.

Nor does it agree with DVS's related contention that the agency failed to provide an adequate explanation for its tradeoff decisions. The record reflects that all of the awardees' non-price proposals were rated more highly than DVS's proposal. In particular, the other offerors to whom DVS compares itself received an "Outstanding" in Innovation, or, if they received the lower "Good" rating, did not receive a "Marginal" rating in any other category as DVS did.

Indeed, the administrative record is replete with evidence that the agency engaged in a process for making its best value tradeoff decisions that was reasonable and consistent with the mandates of the Solicitation. The PEB thus vetted and flagged the proposals with the highest total prices. AR Tab 65c at 4681. None of those proposals were selected for an award. The SSEB reviewed the technical ratings assigned to all of the offerors, summarized them, and described where each offeror ranked in terms of its overall price. See AR Tab 65d.

The record reflects that the SSAC and SSA analyzed and considered price but that they prioritized the proposals' technical ratings, especially Innovation, over price. This is consistent with the Solicitation, which provided that "[w]hen combined all non-price factors are significantly more important than price," and which frequently referenced the importance of innovation to meeting the government's needs. AR Tab 5 at 395.

Finally, the Court concludes that the agency did not place excessive reliance upon adjectival ratings in making its tradeoff decisions. To the contrary, consistent with the requirements of FAR 15.308, the SSA's decision was based on a comparative assessment of proposals against all source selection criteria stated in the Solicitation. See AR Tab 65. The SSA relied upon the reports and analyses prepared by the TEBs, the SSEB, and the SSAC and made an independent judgment as to which offerors would receive an award. Id. at 4659.3, 4659.104. The SSA did not rely exclusively on adjectival ratings to compare the proposals' relative merits; to the contrary, it appropriately used the ratings as guideposts but also considered the strengths and weaknesses of each proposal. It generated thousands of pages of documentation that explains why each of the ratings was assigned. See Wackenhut Servs., Inc. v. United States, 85 Fed. Cl. 273, 297 (2008) (citing Opti-Lite Optical, 1999 WL 152145, at *3 (Comp. Gen. 1999)) ("[A]djectival ratings and point scores are useful as guides to decision-making . . . but . . . must

be supported by documentation of the relative differences between the proposals, their strengths, weaknesses and risks, and the <u>basis and reasons</u> for the . . . decision.").[8]

Indeed, the Court cannot imagine how the agency could have conducted the best value tradeoff in this procurement, without relying on the adjectival ratings to guide the comparison of the proposals. DVS's challenge to the agency's best value tradeoff process, like its other disagreements with the agency's discretionary judgments, is without merit.

### C.    <u>Tenica (Case No. 19-1169)</u>

#### 1.    The Agency's Evaluation

Tenica timely submitted its proposal on April 4, 2017. AR Tab 161. The TEB assigned the proposal eleven strengths, three weaknesses, and two significant weaknesses under Factor 1. AR Tab 65d at 5685–89. For Past Performance, the PPEB found all of Tenica's three references "Recent." <u>Id.</u> at 5690. Reference 2 was found "Somewhat Relevant," but References 1 and 3 were both deemed "Not Relevant." <u>Id.</u> The TEB assigned Tenica's Problem Statement No. 3 three strengths and no weaknesses. <u>Id.</u> at 5691. Its Problem Statement No. 4 received two strengths, one weakness, and one significant weakness. <u>Id.</u> at 5692.

Based on the evaluations, the TEBs assigned Tenica's proposal a "Good" rating for Factor 1, a "Neutral" rating for Factor 2, an "Outstanding" rating for Problem Statement No. 3, a "Marginal" rating for Problem Statement No. 4, and an "Outstanding" rating for Factor 4. <u>Id.</u> at 5684. On review, the SSEB made one change, upgrading the rating for Problem Statement No. 4 from "Marginal" to "Acceptable." <u>Id.</u> at 5696. With that change, the agency assigned Tenica's proposal the following overall ratings:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Neutral | Outstanding | Acceptable | Outstanding |

AR Tab 65 at 4659.83 (SSA ratification of SSEB recommendation); AR Tab 65d at 5696. Tenica's evaluated price ranked [***]. AR Tab 65 at 4659.83.

The SSAC recommended the agency not award a contract to Tenica because its "proposal was priced at the higher end of all of the Offerors" and "was not one of the highest technically rated." AR Tab 65e at 5858. The SSA considered "the benefits offered[,] the risks presented, and

---

[8] The Court notes that at the end of its MJAR, DVS makes a catchall argument that its protest should be sustained because the agency failed to document its evaluation, best value tradeoff, and source selection decisions. DVS MJAR at 37–38. Because its argument relies upon alleged examples of inadequate documentation already addressed (and rejected) earlier in this opinion, the Court deems it unnecessary to separately address this catchall argument.

the prices proposed" by Tenica's proposal and "agree[d] with the SSAC that th[e] proposal is not amongst the most highly rated or the lowest priced and does not represent a best value to the Government." AR Tab 65 at 4659.86. Therefore, the SSA concluded, "it does not merit selection for award." Id.

### 2.    Tenica's Protest

Tenica challenges its ratings on Factors 1 and 2, and for Problem Statement No. 4. In addition, it contends that the agency conducted an unreasonable price evaluation. For the reasons set forth below, the Court concludes that none of these challenges provide a basis for sustaining Tenica's protest.

### a.    Factor 1 Evaluation

The agency assigned Tenica a "Good" rating for Factor 1 based on its determination that the proposal contained eleven strengths, three weaknesses, and two significant weaknesses. AR Tab 65 at 4659.83. Tenica claims that four of the weaknesses the agency assigned were based on its alleged failure to provide certain information that its proposal did, in fact, contain. Tenica MJAR at 22. It challenges the assignment of the fifth weakness as an example of disparate treatment. Id. at 27. Tenica contends that if these weaknesses were removed it would be entitled to an "Outstanding" rating under Factor 1. Tenica's contentions lack merit.

Tenica first contends that the agency wrongly assigned it a weakness for failure to provide required information about how its employees are rewarded for or incentivized to pursue innovation. Tenica MJAR at 23 (quoting AR Tab 161 at 26093–94). It cites to portions of its proposal which it alleges satisfied this requirement. But the portions of its proposal that it claims refute the agency's assessment appear in its Executive Summary, which is contained in Volume I, not in Volume II, Tab C, which is the portion of the proposal that the Solicitation instructs offerors to use to supply the information required for the Factor 1 evaluation. See AR Tab 5 at 369. The Solicitation further provides that "[i]nformation required for proposal evaluation which is not found in its designated volume will be assumed to have been omitted from the proposal." Id. at 371.

In any event, it was not unreasonable for the agency to decide that neither the quoted statements in the Executive Summary, nor the similar discussion contained in Volume II, Tab C, AR Tab 161 at 26156–57, were responsive to the questions about how Tenica incentivizes or rewards employees. The cited portions of the executive summary narrative for Reference 1, for example, describe [***] but do not address what incentives or rewards were provided to the staff for doing so. Id. at 26093. Similarly, the narrative for Reference 2 states that [***]. Id. at 26157. But Tenica again supplies no description of incentives or rewards for the employees who came up with the idea to do so. And finally, the language pertaining to Reference 3 states that [***]. Id. at 26094. It does not describe incentives or rewards for the employees—it merely [***]. See id. (stating that [***]).

The agency also assessed a weakness based on Tenica's failure to provide "adequate methods for measuring the effectiveness of Innovation efforts." AR Tab 65d at 5688. According to Tenica, this topic is addressed in its proposal. Tenica MJAR at 23–24 (quoting AR Tab 161 at

26158–59). But the agency did not assess a weakness based on Tenica's failure to address the topic at all; it assessed a weakness because it concluded that the narrative did not set forth methods for measuring the effectiveness of innovation efforts that were "adequate" to the task. AR Tab 65d at 5688. It explained that "without a clear method" for measuring effectiveness, Tenica would be "less likely to succeed in performing SETI tasks that require mature and detailed measures to manage complex system development in future SETI task orders." AR Tab 65d at 5688.

Tenica challenges the agency assessment of a third weakness based on its failure to provide information about its employee retention rates. Tenica MJAR 24–25. It cites to the Management Information portion of its proposal, which included a [***]. AR Tab 161 at 26125. But this discussion does not appear in Volume II, Tab C and therefore was legitimately not considered by the agency in rating the proposal under Factor 1. See id. Further, the assessed weakness was based on both the failure to provide the retention rate and the failure to provide information about how Tenica tracks employees' education and training. AR Tab 65d at 5688. Tenica's MJAR does not address the latter issue.

The fourth weakness Tenica claims was wrongly assessed concerned its articulation of its approach to risk and risk management. Tenica MJAR 25–26. It mischaracterizes the basis for the agency's assessment of a significant weakness regarding this issue. The agency did not assign a significant weakness because Tenica "[f]ail[ed] to provide information as to what Tenica's approaches to risk management are." See id. at 25. Rather, the agency found that the approach was not "clearly articulate[d]," that it could not discern an "overarching risk governance policy" based on the "minor examples" provided in the proposal, and that—although the proposal contained a graphic entitled "Risk Reduction"—it did not provide an explanation of [***]. AR Tab 65d at 5688. Tenica's motion, which simply reproduces the narrative in its proposal, does not address these concerns at all.

Tenica contends that it was improper for the agency to assess a weakness in its proposal based on its failure to "provide information on when it failed at attempting to deliver Innovation[ and] what it learned from that failure." Tenica MJAR at 27. Tenica justifies not addressing this point at all by asserting that it has "never failed at attempting to deliver innovation." Id. Of course, Tenica did not so state in its proposal. And it was not unreasonable for the agency to conclude that Tenica simply failed to address the question posed, given the improbability of its representation that it has never had an innovation failure.[9]

---

[9] According to Tenica, the Solicitation did not require offerors to expressly note the inapplicability of the question. Tenica MJAR at 27. In fact, Tenica argues, the Solicitation "expressly contemplates" that some offerors will not have any examples to provide. See id. (citing AR Tab 44 at 1537). This argument is not supported by the language of the Solicitation upon which Tenica relies. The Solicitation instructs offerors to "provide an example of when the company failed at attempting to deliver Innovation and what they learned from that failure." AR Tab 5 at 377. It then asks "[w]hat, if any, consequences were there to the employee." Id. The phrase "if any," refers to consequences to employees for failures to deliver innovation, it does not refer to unsuccessful attempts to deliver innovation.

Finally, Tenica alleges that it was a victim of disparate treatment with respect to the assignment of this weakness. Tenica MJAR at 27. It argues that several awardees who did not discuss failed attempts at innovation in their proposals ([***]) were not assigned a weakness on that basis. Id. For the reasons set forth above in discussing an essentially identical disparate treatment claim made by DVS, the Court finds this contention without merit.

### b.      Past Performance Rating

The Solicitation provides that the "past performance evaluation factor assesses the degree of confidence the Government has in an Offeror's ability to supply solutions and services to meet users' needs, based on a demonstrated record of performance." AR Tab 5 at 388 (Section M.2.3 Factor 2: Past Performance). The confidence determination would be based on an analysis of the recency, relevancy, and quality of up to three past performance references for each offeror. Id.

Tenica received a "Neutral Confidence" rating because its "performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." AR Tab 65d at 5690. The rating was based on the agency's determination that two of Tenica's three references were "Not Relevant." Id.

Tenica challenges its "Neutral" rating on several bases. Tenica Mot. for and Mem. in Support of Pl.'s Request for J. on the Admin. R. ("Tenica MJAR") at 14–19, ECF No. 71. First, alleging disparate treatment, Tenica contends that several of the awardees "received the exact same comments for their references as Tenica did, yet for unknown reasons these other proposers received materially higher relevance ratings." Id. at 15. Second, it argues that the agency's classification of two of its references as "Not Relevant" was "internally inconsistent, and arbitrary on its face" because "the Agency also found these 'non-relevant' references to be both very recent and of exceptional quality." Id. at 15, 20. For the reasons set forth below, the Court concludes that each of these arguments lacks merit.

### i.      Disparate treatment

As noted, the agency found two of Tenica's past performance references not relevant. Reference 1 was deemed not relevant because "[b]ased upon the narrative, detail as to the work accomplished by [Tenica] could not be determined." AR Tab 171 at 29383. The agency further explained that Tenica's narrative [***] and that "[t]here was little to no demonstration of the scope and magnitude of effort and complexities this solicitation requires." Id. And while the proposal's narrative stated that Tenica [***] the agency concluded that this description did not "speak to the complexity involved or how the work is innovative." Id. Further, the PPEB found that "[t]he task areas [Tenica] cited were not substantiated in the narrative." Id.

The agency also found Reference 3 "Not Relevant" because it concerned a "sunsetting mission which [did] not cover any task areas" and "involved little or none of the scope and magnitude of effort and complexities this solicitation requires." Id. at 29389. Reference 2, on the other hand, was rated "Somewhat Relevant" because while "[s]ome of the scope and complexity anticipated on SETI is demonstrated," the narrative did not speak to innovation "in any detail," and "[did] not state how or why it is innovative." Id. at 29386.

Tenica alleges the PPEB evaluations of three other offerors that received contract awards (Volant, Innovative Government Solutions, and Synaptek) contained the "the exact same critiques [as those] underlying Tenica's Factor 2 'Neutral Confidence' scores." Tenica MJAR at 16. The fact that these proposals received higher confidence ratings than Tenica's, it argues, reflects disparate treatment.

Tenica has failed to persuade the Court that the agency "unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." Office Design Grp., 951 F.3d at 1372. At most, Tenica has shown that the PPEB found that the agency employed some similar language in its evaluations of the other offerors' references and its evaluation of Tenica's references. But beyond that, Tenica ignores the material differences between the references revealed by the PPEB's evaluation.

For example, Tenica observes that Volant's proposal received a rating of "Substantial Confidence" notwithstanding that the PPEB found that one of Volant's references (like Tenica's) did not "clearly demonstrate the specifics of innovation" and did not "provide enough detail in the description as to what the offeror actually performed." Tenica MJAR at 16–17. But while the agency observed that Volant did not "clearly demonstrate" how the work it had performed under Reference 1 was innovative, it nonetheless found the reference relevant because it showed that Volant "was able to use newer technology in a complex environment," because "[m]any task areas [were] addressed," and because the "scope and magnitude of effort and complexities required to develop, deploy and integrate" under the referenced contract "is similar to SETI." AR Tab 171 at 29457.

Similarly, the agency criticized Volant's Reference 2 on the grounds that "[t]ask areas [were] addressed broadly, but there is not enough detail in the description as to what the offeror performed." Id. at 29458. But Tenica again ignores that the agency also found that Volant's Reference 2 demonstrated a "[s]imilar scope and magnitude of effort and complexities [to the SETI contract] . . . through the breadth of work that was required," and that the reference demonstrated at least "a minor innovation . . . through the development of a prototype that was subsequently deployed in multiple environments which is similar to SETI." Id.

Tenica's effort to compare the evaluation of its past performance proposal to that of Innovative Government Solutions ("IGS") is similarly unavailing. Tenica finds it "curious," that IGS received a substantial confidence rating given what it calls the agency's "admissions that the references themselves demonstrated important areas in which the offeror could not demonstrate relevance." Tenica MJAR at 17. It observes that the agency "critiqued one of [Tenica's] references as only demonstrating innovative practices with limited detail, and critiqued another reference as only speaking to a developed strategy for innovation but not to the actual deployment of innovation." Id.

But in selectively citing these critiques of IGS's performance references, Tenica again glosses over the aspects of the proposal that the agency relied upon to find them relevant. For example, the agency deemed IGS's Reference 1 "Somewhat Relevant" because it concluded that [***]. AR Tab 171 at 28826. To be sure, the agency also critiqued the fact that [***]. Id. Nonetheless, it also found that "[***] which involved some of the scope and magnitude of effort and complexities this solicitation requires." Id. Similarly, the agency found IGS's Reference 2

"Relevant" notwithstanding that "[t]he narrative demonstrated innovative practices with limited detail" because it "describe[d] the deployment of a [***] resulting in some improvements" and "involved [a] similar . . . scope and magnitude of effort and complexities [as] this solicitation requires." Id. at 28827. And its Reference 3 was found "Very Relevant" because under the referenced contract IGS had "[a]rchitected, engineered and developed a complex DoD enterprise network which is nearly identical to the scope and complexity SETI is anticipated to require." Id. at 28830.

Finally, Tenica observes that Synaptek received a "Satisfactory Confidence" rating despite the PPEB's conclusion that "one of its references could not be evaluated due to non-compliance and another of its references failed to demonstrate innovation." Tenica MJAR at 17. Tenica is correct that the agency declined to consider Reference 1 in Synaptek's proposal. And while it is also true that the agency concluded that Reference 2 did not demonstrate innovation, the agency nonetheless found it "Somewhat Relevant" because the "[p]ast performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires." Id. at 29301. Syanptek's "Satisfactory" confidence rating was therefore based on the fact that— unlike Tenica—its third performance reference was deemed "Relevant." Id. at 29304. That determination was based on the agency's conclusion that the reference "demonstrate[d] a project of . . . complexity for a standard deployment across a joint environment and involved some innovation through the automation of security" which "involved similar scope and magnitude of effort and complexities SETI is anticipated to require." Id.

In short, the performance references of Tenica and its proposed comparators are materially different. In light of those differences, the agency's evaluation of Tenica's references is not inconsistent with its evaluation of the references of the comparators. Tenica's disparate treatment argument therefore lacks merit.

## ii.        Internal inconsistency

In addition to disparate treatment, Tenica alleges that the agency's classification of two of its references as "Not Relevant" was "internally inconsistent, and arbitrary on its face" because "the Agency also found these 'non-relevant' references to be both very recent and of exceptional quality." Tenica MJAR at 15, 20. Specifically, Tenica argues, if there was enough detail in the references to establish that its performance was "Exceptional," then there must have been enough detail to show that they were also relevant.

The Court disagrees. The determination of relevance requires that the referenced "effort involve[] similar scope and magnitude of effort and complexities th[e] solicitation requires." Gov't MJAR at 72 (quoting AR Tab 5 at 389). The quality assessment, on the other hand, focused upon whether "[c]ontractor performance . . . met . . . or exceeded [contractual requirements] to the Government's benefit," based on the number of problems that occurred during performance and the effectiveness of "corrective actions" taken by the contractor. AR Tab 5 at 389. It is therefore entirely possible for the agency to conclude that a reference reflected high quality work but that Tenica had failed to supply sufficient detail to establish that the work performed was of a scope, magnitude, and complexity comparable to the work required to perform on the SETI contract. And to the extent that Tenica challenges the agency's conclusions that it provided insufficient information to establish the relevance of References 1 and 3, the

Court notes that it was up to the agency's subject-matter experts to assess whether the detail provided established the relevance of the references. Tenica's mere disagreement with that assessment does not provide grounds for setting it aside.

Tenica's claims regarding the propriety of the agency's characterization of Reference 3 as "Not Relevant" based on the fact that the project involved a sunsetting mission is equally without merit. Tenica MJAR at 20 (quoting AR Tab 46 at 2560). The Court agrees with Tenica that "neither the Solicitation nor the Acquisition Plan contain <u>any</u> prohibition against references involving 'sun-setting' projects.'" Tenica MJAR at 20. But the agency did not find the reference "Not Relevant" because it involved a sunsetting mission; it stated that the reference was not relevant because it did not cover the task areas identified in the Solicitation and it was not comparable to the SETI contract in terms of its scope, magnitude, or complexity of effort. AR Tab 171 at 29389. Accordingly, the Court rejects Tenica's contention that the agency's relevancy determinations were arbitrary and capricious or internally inconsistent.

<strong>c.      Problem Statement No. 4 Evaluation</strong>

The agency assigned Tenica two strengths, one weakness, and one significant weakness under Problem Statement No. 4. AR Tab 65d at 5692. The weakness assigned was based on the agency's conclusion that Tenica did not "adequately address [its] assumptions and techniques to be used in completing this effort, including those related to the various disciplines involved." <u>See id.</u> The significant weakness assigned was based on the agency's conclusions that Tenica's proposal "discusses the views [it] will use but not why [it] would use those views" and that "[a] quality architecture requires not only specific views but also a purpose for those views in order for them to provide useful information for decision makers." <u>Id.</u>

Tenica argues that these determinations were arbitrary and that it should have received an "Outstanding" rather than merely an "Acceptable" rating for Problem Statement No. 4. Tenica MJAR at 28–29. First, according to Tenica, the agency's criticism of its failure to "adequately address assumptions and techniques" was unjustified because its narrative identified at least three of the assumptions underlying its response to the problem statement. AR Tab 65d at 5692; <u>see id.</u> at 28. It also notes that "the Solicitation did not require offerors to separately identify or break out any particular assumptions used in responding to Problem Statement No. 4, and merely required offerors to address the assumptions – which TENICA did." Tenica MJAR at 28.

Tenica's observations do not establish that the agency's assessment lacked a rational basis. The agency found Tenica's handling of Problem Statement No. 4 flawed because it found that Tenica's treatment of both its assumptions and techniques was inadequate. AR Tab 65d at 5692. Even assuming Tenica identified three assumptions in its response, that does not speak to the question of whether it "adequately address[ed]" its assumptions. <u>Id.</u> And in any event, this Court is in no position to substitute its opinion for that of the agency's experts in deciding the sufficiency of Tenica's response to a hypothetical problem in a highly technical area.

Tenica's challenge to the agency's assignment of a significant weakness with respect to Problem Statement No. 4 is similarly unpersuasive. Tenica observes that it "provided a chart within its proposal that fully demonstrated [***]." Tenica MJAR at 28. But directing the Court to a chart that Tenica believes the agency experts should have found sufficient to address their

technical concerns does not supply the Court with a basis for finding the agency's contrary determination irrational. Instead, it reflects only Tenica's disagreement with the agency's judgment call. Therefore, Tenica's challenge to the assignment of weaknesses under Problem Statement No. 4 is unavailing.

### d.   Price Evaluation

Tenica challenges the agency's price reasonableness analysis on grounds similar to those pressed by DVS. The Court finds those arguments unpersuasive for the reasons set forth above with respect to DVS's protest.

Moreover, and in any event, Tenica has failed to show that—but for the alleged infirmities in the price reasonableness analysis—it would have had a substantial chance of receiving one of the awards. In fact, Tenica's price itself was in the high range among all offerors. It was also higher than the prices of twenty-four of the thirty most highly rated proposals (which did not include Tenica's). See AR Tab 65 at 4659.86 (SSA memorandum noting that Tenica's "proposal was priced at the higher end of all of the Offerors"); AR Tab 54 at 3432–33 (source selection document listing the thirty highest rated offerors and their proposed prices).

Tenica's prejudice argument itself is not based on its claim that the agency's price reasonableness analysis was flawed. Instead, it contends that the agency did not determine "whether the lower-priced offerors could achieve the promised technical solutions for the offered prices," and that it was prejudiced by that alleged error because the five awardees who received only a "Good" rating for Factor 1 [***]. Tenica MJAR at 31. But the error with which Tenica charges the agency does not concern price reasonableness; it concerns price realism. See Agile Def., Inc. v. United States, No. 19-1954, 2020 WL 2844705, at *3 (Fed. Cir. June 2, 2020) (quoting First Enter. v. United States, 61 Fed. Cl. 109, 123 (2004)) ("[P]rice reasonableness generally addresses whether a price is too high, whereas cost realism generally addresses whether a cost estimate is too low."); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5 (2010) (observing that "a price reasonableness analysis has the goal of preventing the government from paying too much for contract work" while a price realism analysis "investigates whether the contractor is proposing a price so low that performance of the contract will be threatened"). Because the Solicitation did not require the agency to conduct a price realism analysis, its failure to do so cannot serve as a basis for establishing prejudicial error. For this reason as well, Tenica's challenge to the agency's price evaluation lacks merit.

### D.   <u>Tapestry Technologies, Inc. (Case No. 19-1189)</u>

### 1.   The Agency's Evaluation

Tapestry Technologies, Inc. ("Tapestry") submitted its proposal on April 4, 2017. AR Tab 159 at 25349 (Tapestry proposal). The TEBs assigned the proposal an "Acceptable" rating for Factor 1, a "Satisfactory Confidence" rating for Factor 2, "Outstanding" ratings for both problem statements under Factor 3, and an "Acceptable" rating for Factor 4. AR Tab 65d at 5665.

On review, the SSEB upgraded Tapestry's rating for Factor 2 from "Satisfactory Confidence" to "Substantial Confidence." Id. at 5669 (explaining that "[o]verall, the quality ratings for the three references ranged from very good to exceptional"). On the other hand, it downgraded the rating for Problem Statement No. 4 from "Outstanding" to "Good." Id. at 5672 (citing AR Tab 5 at 391) (explaining that the two strengths the PSEB awarded indicated a "thorough" but not "exceptional" approach and understanding of the problem's requirements). As a result, the SSEB assigned Tapestry the following ratings:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Acceptable | Substantial | Outstanding | Good | Acceptable |

AR Tab 65d at 5674. It proposed a price of [***]. Id.; AR Tab 63a at 4659.

The SSAC recommended against an award to Tapestry. It observed that while Tapestry's price was among the lowest, it "failed to achieve a rating of higher than 'Acceptable' in the most important factor," which was "the distinguishing difference between those recommended for award and [Tapestry]." AR Tab 65e at 5868. The SSA agreed and, as a result, Tapestry was not among the awardees. AR Tab 65 at 4659.94–.96.

## 2.    Tapestry's Protest

Tapestry poses multiple challenges to the agency's evaluation of its proposal. These include contentions that the agency arbitrarily assigned weaknesses to its proposal under Factor 1, while also unreasonably failing to award strengths under both Factors 1 and 4. Tapestry also alleges disparate treatment in the Agency's assignment of strengths and weaknesses. Tapestry challenges as arbitrary and capricious the SSEB's decision to downgrade its rating for Factor 3, Problem Statement No. 4 from "Outstanding" to "Good." In addition, it contends that the Agency's best value tradeoff decision was flawed in several respects. Finally, Tapestry challenges the agency's price reasonableness analysis.

The majority of Tapestry's arguments challenge the judgments of the agency's experts regarding the technical merits of its proposal or the proposals of its competitors. As the Court emphasizes throughout its opinion, these are judgments to which it must defer so long as the record reveals that they have a rational basis. The Court is similarly skeptical of Tapestry's disparate treatment arguments because Tapestry does not argue that its proposal is substantively indistinguishable from the proposals of competitors that received more favorable ratings. Instead, it argues that the proposals are "very similar." For those reasons and the others set forth below, the Court concludes that Tapestry's protest lacks merit.

### a.    Factor 1 Evaluation

The IEB assigned Tapestry four strengths and four weaknesses under Factor 1. See AR Tab 65d at 5666–68. As a result, Tapestry received an "Acceptable" rating. Id. at 5668. Its

failure to earn at least a "Good" rating under Factor 1 ultimately played a critical role in the agency's decision not to award it a contract. See AR Tab 65 at 4659.97.

Tapestry contends that the weaknesses the agency assigned "were inconsistent with the terms of the Solicitation or otherwise unreasonable," and that "[i]n assigning many of these weaknesses, DISA ignore[d] relevant elements of Tapestry's proposal." Pl.'s Mot. for J. on the Admin. R. ("Tapestry MJAR") at 7, ECF No. 80. Tapestry also contends that the agency unreasonably failed to assign certain strengths to the proposal under Factor 1. Id. at 11–14. Finally, it contends that the agency engaged in disparate treatment with respect to its evaluation of certain features of Tapestry's proposal under Factor 1. Id. at 18–26 The Court addresses each of these arguments below.

### i.   Assignment of weaknesses based on lack of detail regarding tracking and measurement of ROI

Under the Corporate Philosophy/Culture on Innovation category of Factor 1, the Solicitation instructed offerors to describe their approach to risk and explain "the company's process for selecting innovation projects." AR Tab 5 at 377. The agency assigned a weakness to Tapestry's proposal related to these requirements. AR Tab 65d at 5667. Specifically, the agency pointed out that in section 2.3 of Tapestry's proposal (which is entitled "Approach to Innovation Risk") Tapestry had referenced "a project selection process outlined in Section 2.5 on page 6." Id.; see also AR Tab 159 at 25475. But it noted, however, that "there is no such process detailed on page 6, anywhere in section 2.5, or anywhere else in the proposal." Id. In addition, the agency observed, the proposal stated (again at section 2.3, AR Tab 159 at 25475) that Tapestry "[***] described on page 8 in Section 2.6," AR Tab 65d at 5667. Nonetheless the agency concluded that "the process outlined [in section 2.6] is extremely limited in detail and does not specify how [Tapestry] [***]." Id. According to the agency, Tapestry's "inability to showcase and/or detail how [it] [***]." Id.

Tapestry argues that "[i]n assigning this weakness, DISA relies on an incorrect section of Tapestry's proposal and ignores information in another section [i.e., 2.6] that directly addresses the concerns." Tapestry MJAR at 7. While the Court agrees that the explanation the agency provided for assigning this weakness is not a model of clarity—it rejects Tapestry's argument that the agency's concern was that the proposal contained no selection process at all. See id. at 8. Instead, the Court understands that the agency assigned the weakness because it concluded that Tapestry's proposal at section 2.6 (which is entitled "Process For Selecting Innovation Projects") did not contain sufficient detail about how Tapestry [***]. And the agency found this flaw significant because section 2.3 (which deals with approach to innovation risk) cross references section 2.6, stating that it "[***] using methods described in Section 2.6 . . . to ensure we are working on the right things and producing optimal results." AR Tab 159 at 25475.

Tapestry also contends that the agency ignored section 2.3 of its proposal, entitled "Approach to Innovation Risk," in assigning this weakness. Tapestry MJAR at 8. It observes that "Section 2.3 specifically discusses [***].'" Id. (quoting AR Tab 159 at 25475). But this passing reference to [***] does not address the flaw the agency identified, which is that the proposal did not provide details regarding how Tapestry tracks and measures ROI.

Tapestry further argues that the assignment of the weakness regarding [***] is inconsistent with the agency's decision to give Tapestry's proposal "two separate strengths for its [***]." Id. (citing AR Tab 65d at 5670). But the two strengths Tapestry references were assigned by a different TEB, and concerned its response to Problem Statement No. 3, which is evaluated under Factor 3. The assignment of strengths based on its responses under Factor 3 does not call into question the rationality of the agency's conclusion that Tapestry's Factor 1 proposal contained insufficient detail about how it [***].

Finally, in its reply, Tapestry alleges that the agency "held [it] to an unreasonably high standard with [***]" as compared to proposals submitted by Synergy and Synaptek. Tapestry Resp. in Opp'n to Def.'s Cross-Mot. for J. Upon the Admin. R. & Reply to Def.'s Resp. to Pl.'s Mot. for J. Upon the Admin. R. ("Tapestry Reply") at 3–4, ECF No. 131. The Court declines to consider these disparate treatment arguments because they were made for the first time in Tapestry's reply. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."). And in any event, Tapestry's disparate treatment claims lack merit because the proposals to which it compares its own contained materially different features.[10]

### ii.       Assignment of weakness regarding innovation project tracking

Tapestry challenges the agency assignment of a weakness based on its response to the Solicitation's requirement under Factor 1 that it explain how it assesses, measures, and tracks innovation, as well as its "methods for measuring the effectiveness of Innovation efforts." See AR Tab 5 at 377; AR Tab 65d at 5667. In assessing this weakness, the agency acknowledged that Tapestry's proposal included a so-called [***]. AR Tab 65d at 5667. But the agency found Tapestry's response inadequate because it concluded that the proposal consisted largely of "very high-level statements" and insufficient detail about "how Tapestry tracks innovation." Id. The agency explained that this "flaw. . . increases the risk of failure to be innovative" because it was "not clear whether [***]." Id. (discussing AR Tab 159 at 25478).

Tapestry contends that—contrary to the agency's determination—its proposal "addresses how it tracks innovation in the exact sections that DISA points out in the identified weakness" (i.e., in sections 2.6 and 2.7). Tapestry MJAR at 9. Tapestry notes further that "section 2.7 refers the reader to section 4, which lists real-world examples that support Tapestry's statement[s]." Id. But Tapestry's expression of disagreement with the agency's judgment regarding the sufficiency of its narratives does not persuade the Court that the agency's determination was irrational. Indeed, the Court's review of the narrative in Tapestry's proposal concerning project selection reveals ample basis for the agency's view that it lacked detail. See, e.g., AR Tab 159 at 25478

---

[10] Thus, Synaptek's proposal also does not appear to explain how it [***] in connection with innovation projects. See AR Tab 157 at 24936 (explaining that [***]). But Synaptek's proposal for tracking and prioritizing innovation projects contains a number of features not contained in Tapestry's proposal. See id. at 24935–36 (Synaptek) (explaining its [***]). Synergy's proposal is similarly distinguishable from Tapestry's. See, e.g., AR Tab 158 at 25190 (explaining that it [***]) (emphasis removed); id. (explaining exactly how [***]).

(observing that [***]). And the Court finds unilluminating Tapestry's citation of strengths assigned to other parts of its proposal. See Tapestry MJAR at 10 (discussing strengths assigned related to its success with [***]). Therefore, Tapestry's challenge to the agency's assignment of a weakness because the proposal contained insufficient detail about how Tapestry tracks innovation cannot be sustained.

### iii.     Assignment of weakness regarding methodology for making spending decisions

Tapestry also challenges the agency's assignment of a weakness concerning the Investment in Innovation aspect of Factor 1. The Solicitation directed offerors to "[d]escribe how the company makes decisions on how, when and how much to spend on Innovation . . . [and] if your company has supported Internal Research & Development (IR&D)." AR Tab 5 at 377. The agency concluded that although Tapestry's proposal revealed "[***]." AR Tab 65d at 5667. Further, the agency determined, although Tapestry "provide[d] some detail on how they make decisions as it relates to sponsoring innovative initiatives . . . they do not detail in their proposal how they decide how, when, and how much to spend on innovation." Id. These omissions raised the risk of "unsuccessful contract performance," the agency found, "because an Offeror without a clear vision for deciding how, when, and how much to spend on new innovation initiatives is less likely to succeed in performing SETI tasks that require recommendations as to how, when, and how much to invest for different innovative projects." Id. at 5667–68.

Tapestry argues that—contrary to the agency's determination—it did supply the agency with information about its process of deciding how, when, and how much to spend on its innovation projects. In fact, according to Tapestry, it provided more detail than other offerors who did not receive a weakness under this aspect of Factor 1. See Tapestry MJAR at 10–11 (referring to section 3.1 of its proposal); Tapestry Reply at 7 (referring to section 2.6 of its proposal and discussing Synergy's proposal).

The Court disagrees. The portions of its proposal that Tapestry cites do not explain the criteria it uses when deciding how much or when to spend on innovation projects. See, e.g., Tapestry MJAR at 10–11 (quoting AR Tab 159 at 25480) (stating that its [***]). It was therefore not unreasonable for the agency to assign a weakness to the proposal based on its lack of detail and specificity.

Further, the Court rejects Tapestry's claim that its proposal "provided more detail concerning its innovation investment decision process than Synergy, which did not receive a weakness on this basis." Tapestry Reply at 7. Tapestry cannot successfully pursue a disparate treatment claim because Synergy's proposal and Tapestry's proposal are materially different. For instance, Synergy [***]. AR Tab 158 at 25191. Because the proposals are not substantively indistinguishable, Tapestry's disparate treatment claim is unavailing.

### iv.     Failure to assign strength for exceeding requirements

Tapestry alleges that its proposal addressed two thirds of the agency's "primary innovation interests," see AR Tab 5 at 376 (capitalization altered), as well as all PWS subtasks,

see AR Tab 1 at 11–33, even though it had no obligation to address either under the Solicitation. Tapestry MJAR at 12. It contends that its "broad coverage of DISA functions" supplied "'evidence of sustained, year-after-year investment in technologies and innovative ways to develop new capacity, improve service, reduce costs, and create efficiencies,' which the Solicitation cites as warranting a higher rating under Factor 1." Id. (citing AR Tab 5 at 388). Accordingly, Tapestry contends, it should have been assigned a strength under Factor 1 for "exceeding DISA's requirements for current primary innovation interests and the SETI PWS." Tapestry MJAR at 12 (capitalization altered).

This argument is a non-starter. A "strength" is defined in DoD's Source Selection Procedures as "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." U.S. Dep't of Def., Source Selection Procedures 40 (2016), https://www.acq.osd.mil/dpap/policy/policyvault/USA004370-14-DPAP.pdf. The Court has no basis to make judgments regarding the value to the agency of the additional information Tapestry supplied in its proposal, especially where the Solicitation explicitly stated that offerors were not required to address all PWS subtasks or the agency's "primary innovation interests." AR Tab 5 at 376, 386. Accordingly, the Court rejects Tapestry's contention that it should have been awarded a strength under Factor 1 on these bases.

**v.      Failure to assign strength based on human capital investment in innovation**

Section M of the Solicitation states that offerors "may be evaluated more favorably and achieve higher ratings" for, among other things, "[d]emonstrated continuous investment in Innovation through evidence of sustained, year-after-year investment in technologies and innovative ways to develop new capability, improve service, reduce costs and create efficiencies" or "[d]emonstrated evidence of ongoing corporate investment in tools, training, facilities, personnel and equipment." AR Tab 5 at 388. Tapestry contends that, given these criteria, the agency should have assigned it an additional strength for human capital investments under the category of investment in innovation. Tapestry MJAR at 13. According to Tapestry, its proposal earned that recognition because it "went above and beyond the Solicitation's requirements when it comes to ensuring that its people are positioned to excel." Id. It explained that it has [***]. Id. (quoting AR Tab 159 at 25480).

Tapestry again asks the Court to second guess the agency's decision regarding the value of particular features of its proposal. But it has not persuaded the Court that the agency could not have rationally decided that Tapestry's provision of these training and educational benefits to its employees did not merit the assignment of a strength. For one thing, the proposal's description of these tools does not provide evidence of the kind of "ongoing" or "sustained, year-after-year investment[s]" described in section M. AR Tab 5 at 388. For another, determining whether a proposal merits a strength because it goes above and beyond the agency's requirements involves

a judgment that is quintessentially the agency's to make. Therefore, Tapestry's challenge lacks merit.[11]

### vi.    Disparate treatment in the assignment of strengths

Finally, Tapestry alleges unequal treatment in the agency's assignment of strengths under Factor 1. First, it contends that the agency awarded strengths to A Square Group ("ASG"), Synaptek, and Versa Integrated Solutions, Inc. ("Versa") but not to Tapestry, "for language that was in Tapestry's proposal, but not in other proposals." Tapestry MJAR at 18–19 (citing AR Tab 159 at 25485). Specifically, under the category of History of Engineering and Deploying Innovative Solutions, the offerors were directed to "describe how your company builds acceptance of Innovation and its necessary disruption to your business culture." AR Tab 5 at 377. Tapestry responded that it [***]. AR Tab 159 at 25485. It observes that the agency employed virtually the same language in describing its reasons for assigning strengths to the proposals of the other three offerors and yet did not assign such a strength to Tapestry's proposal. See Tapestry MJAR at 18; AR Tab 65d at 4773, 5625, 5740 (observing that offerors "prototype[d] the new processes in limited technology groups[] rather than rolling them out to the entire group first[] to ensure feedback was captured and the process was fine-tuned prior to full implementation").

Tapestry's unequal treatment argument lacks merit. To be sure, the other offerors, like Tapestry, described the use of [***]. See, e.g., AR Tab 157 at 24944 (Synaptek proposal § C.3.4); AR Tab 131 at 12771–72 (ASG proposal § 1.3.5). But the agency awarded strengths to the other offerors based on multiple aspects of their proposals, finding that they "describe[d] a thorough approach for building acceptance of Innovation and its necessary disruption into their business culture." See AR Tab 65d at 4773 (ASG evaluation) (assigning a strength because ASG "describes a thorough approach for building acceptance of Innovation" and supplied evidence in its [***]); id. at 5625 (Synaptek evaluation) (describing among other things the [***]); id. at 5740 (Versa evaluation) (observing that Versa described [***]). The Court therefore rejects Tapestry's argument that it was subjected to disparate treatment when it was not similarly awarded a strength for its prototyping process.

Tapestry's second disparate treatment claim is based on the contention that the agency awarded strengths to Synaptek's proposal "for Factor 1 elements [that were] also present in Tapestry's proposal." Tapestry MJAR at 19. For example, Tapestry observes, Synaptek "receive[d] a strength for its response to 'the methods for measuring the effectiveness of Innovation efforts.'" Id. (citing AR Tab 61 at 4407; AR Tab 157 at 24936 (section of Synaptek's

---

[11] In its reply brief, Tapestry contends that other offerors (Innovations NexGen JV, Mission Support, and BCMC) received strengths for human capital investment features included in Tapestry's proposal. Tapestry Reply at 9–10. Tapestry failed to raise this disparate treatment claim in its opening brief; accordingly it is waived. Moreover, and in any event, the claim lacks merit because Tapestry's proposal is substantively different from the proposals of these other comparators. See Def.'s Consolidated Reply in Support of Cross-Mot. for J. Upon the Admin. R. at 76–78, ECF No. 140 (discussing differences).

proposal meeting these requirements)). Tapestry argues that its proposal—which it contends includes "very similar features to those proposed by Synaptek," id. at 20—should also have been assigned a strength. It takes a similar tack with respect to its other contentions of disparate treatment between its proposal and Synaptek's. See id. at 21 (citing AR Tab 159 at 25473, 25478, 25485) (reciting features of its proposal and contending that it should have also received a strength under the investment in innovation category because its proposal "contains very similar features to those for which Synaptek receives a strength"); id. at 22 (arguing that "Tapestry deserves a strength" under the topic of "history of engineering and deploying innovative solutions," because "it proposes very similar approaches" to those which formed the basis for the agency's decision to assign Synaptek a strength.).

The Court does not possess the expertise to determine how the features of Synaptek's proposals compare to those of Tapestry in terms of their value to the agency; nor is it equipped to second guess agency determinations regarding whether particular proposals contain sufficient detail to address the Solicitation's requirements. The same is true as to most of the other comparisons that Tapestry asks the Court to make throughout much of its MJAR. The bottom line is this: even assuming that the features of other offerors' proposals were "similar" or even "very similar" to its own (as Tapestry contends), differing ratings assigned to "similar" proposals do not establish disparate treatment under Office Design Group. As the Court explained above, to protect the agency's authority to make distinctions among proposals based on its own expertise, the proposals must be substantively indistinguishable to justify a finding of disparate treatment. Tapestry does not even allege that this threshold is met as to any of its disparate treatment arguments. Tapestry's disparate treatment arguments as to the assignments of strengths to Synaptek and other offerors such as ASG which are also discussed in its MJAR therefore fail.

### b.      Factor 3 Evaluation

As set forth above, the PSEB assigned Tapestry two strengths and no weaknesses for Problem Statement No. 4. AR Tab 65d at 5671. The SSEB reviewed and discussed the strengths assigned and left them in place. Id. at 5672. Nonetheless, the SSEB downgraded its Factor 3, Problem Statement No. 4 rating from "Outstanding" to "Good." Id. Tapestry argues that the downgrade was not adequately explained and was arbitrary. Tapestry MJAR at 14–15. It observes that "[t]he RFP contains no provision that a rating of 'Outstanding' requires that an offeror receive more than two strengths," nor does the agency give an additional explanation for "why the particular strengths assigned did not indicate 'an exceptional approach and understanding.'" Id. at 15 (quoting AR Tab 5 at 391).

But the SSEB did not state that it downgraded the Problem Statement No. 4 rating because Tapestry's proposal did not earn more than two strengths, as Tapestry contends. See AR Tab 65d at 5672. To the contrary, upon review and discussion, the SSEB made a qualitative determination that "the specific merit of the two (2) strengths identified [] did not indicate an exceptional approach and understanding of the requirements; rather, it indicated a thorough approach and understanding of the requirements." Id. The SSEB's explanation is consistent with the terms of the Solicitation, under which a "Good" proposal "indicates a thorough approach and understanding of the requirements" and "contains strengths which outweigh any weaknesses," and an "Outstanding" proposal "indicates an exceptional approach and understanding of the requirements" and contains strengths that "far outweigh any weaknesses." AR Tab 5 at 391.

Of course, the determination of what characteristics make an offeror's approach "exceptional" as opposed to merely "thorough" is a largely subjective one. It was the SSEB's considered judgment—in disagreement with the PSEB—that the two strengths assigned to Problem Statement No. 4 were insufficient to render Tapestry's response to Problem Statement No. 4 an exceptional one. That is not a judgment amenable to second guessing by the Court; in fact, Tapestry itself does not argue that the agency abused its discretion in downgrading the rating—its quarrel is with what it claims was the agency's failure to adequately explain its decision.

In any event, Tapestry has failed to demonstrate that it was prejudiced by receiving a "Good" rather than outstanding rating under Problem Statement No. 4—i.e., that were it not for that rating, it would have had a substantial chance of receiving an award. See Weeks Marine, 575 F.3d at 1359 (citing Info. Tech & Applications v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.")). The best value determination was based on the higher degree of risk associated with Tapestry's proposal under Factor 1. AR Tab 65 at 4659.97. A slight upgrade in its rating for Problem Statement No. 4, from "Good" to "Outstanding," would not have moved Tapestry's proposal into contention. For that reason as well, this protest ground is rejected.

### c.      Factor 4 Evaluation

The Solicitation states that proposals would be evaluated under Factor 4 (Utilization of Small Business) to determine "the extent to which Offerors have in place effective procedures to ensure proper flow-down of requirements, process management, and performance assessments of small business utilization at lower tiers." AR Tab 5 at 392. In its evaluation, the agency determined that Tapestry did not have such procedures in place. AR Tab 50 at 3274 (Factor 4 consensus evaluation). Tapestry contends that the agency's decision lacked a rational basis because the teaming agreements it supplied with its proposal reflected such procedures. Tapestry MJAR at 16. In fact, Tapestry argues, it should actually have been assigned a strength for meeting this requirement, which would have resulted in a "Good" rather than merely "Acceptable" rating on Factor 4. Id. at 18.

This contention fails because Tapestry has not established that had it received a "Good" rating for Factor 4 it would have had a substantial chance of receiving an award. It also fails on the merits because the narrative of the small business volume of Tapestry's proposal does not include any discussion of this requirement; nor did it reference the teaming agreements upon which Tapestry now relies. See AR Tab 159 at 25643–44. In fact, notwithstanding that Tapestry provided the teaming agreements along with Volume III (the small business volume), the Solicitation provided that they were to be submitted at Tab B of Volume II (the technical proposal). AR Tab 5 at 375. Because Tapestry did not address these requirements in its proposal narrative, it was not irrational for the agency to decide that it merited only an "Acceptable," rather than a "Good" rating.

### d.      The SSA's Best Value Tradeoff Decision

In addition to challenging the agency's decisions regarding the assignment of strengths and weaknesses, Tapestry also challenges the SSA's best value tradeoff analysis on the grounds that 1) the SSA improperly relied on a mechanical application of adjectival ratings; 2) the SSA failed to provide any rational explanation for its decision to make contract awards to three offerors that received "Marginal" ratings on their problem statements; and 3) the SSA failed to meaningfully consider the offerors' prices. Id. Like Tapestry's previous claims, the Court finds that these lack merit.

### i.      Reliance on adjectival ratings

Tapestry argues that "[t]he SSA's cost-technical tradeoff decision relies exclusively on references to adjectival ratings as the basis for DISA's decision not to make an award to Tapestry." Tapestry MJAR at 27. In addition, Tapestry notes, "[t]he SSA's source selection decision must represent his or her own independent judgment, and must be 'documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.'" Id. (quoting FAR 15.308). Tapestry contends that the SSA decision runs afoul of the FAR because it consists of "'[c]onclusory statements, devoid of any substantive content," thereby "'threatening to turn the tradeoff process into an empty exercise.'" Id. (quoting One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 77 (2013) (quoting Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008)).

This argument is unavailing. The FAR requires that the SSA base his decision "on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308 (emphasis supplied). But FAR 15.308 permits the SSA to rely upon the evaluations conducted by the TEBs and the recommendations made by the SSAC in performing that comparative assessment. See Comput. Sci. Corp. v. United States, 51 Fed. Cl. 297, 320 (2002) ("[T]he court does not interpret § 15.308 as requiring the SSA to conduct his own contract-by-contract comparative assessment [when evaluating offerors' past performance]."). Indeed, the FAR "mandates that the SSA 'shall . . . [c]onsider the recommendations of advisory boards or panels.'" Id. (quoting FAR 15.303(b)(5)). "[A]s long as the agency evaluators conducted a [comparative] assessment, the SSA may rely on th[eir] evaluations without performing the same detailed analysis." Id.

Furthermore, a review of the record here shows that the SSA did not base his best value tradeoff analysis on a mechanical application of adjectival ratings but on a balance of the proposal's strengths and weaknesses against its relatively low price tag. He explained that Tapestry was one of the lowest priced offerors but that it received only an "Acceptable" rating for the Innovation factor, which was the most important of all of the technical factors. AR Tab 65d at 4659.97. Indeed, the SSA noted that the Solicitation "was about Innovation and was looking to attract the most innovative offerors." Id. The SSA therefore reasonably found it significant that Tapestry's rating for Innovation was lower than the ratings of all of the successful offerors.

But the SSA did not decide not to award Tapestry a contract based solely on its relatively mediocre rating for Factor 1. He acknowledged both the low price of the proposal and Tapestry's

"successful track record," as well as the fact that it had "demonstrated the ability to solve" the problems the agency presented, as reflected in its ratings for the problem statements. Nonetheless, he explained, "[w]hen I consider the Offeror achieved the highest rating in the second most important factor and in one of the Problem Statements, and proposed a low total [] price[,] I need to contemplate the risk of unsuccessful performance and consider whether this Offeror presents the best value to the Government." Id. Focusing on the risk of unsuccessful performance, he reasoned that "[t]he solicitation was looking for Innovative Offerors . . . as reflected in the most important standalone factor, Innovation." Id. He explained that he was "not willing to tradeoff a lower price for an Offeror who has demonstrated risk of unsuccessful performance to be 'no worse than moderate' when [he could] select offerors who have achieved ratings where the risk of unsuccessful performance is 'low' or 'very low' for the most important factor." Id.

The Court concludes that the SSA's analysis comported with the requirements of the FAR and reflected rational decision making. To be sure, the SSA used the adjectival ratings as guides for conducting the tradeoff analysis. But that is the purpose of adjectival ratings generally and particularly in a procurement like the present one, which required the analysis of highly technical proposals submitted by almost 100 offerors. Further, it was appropriate for the SSA to use the adjectival ratings as shorthand to explain the procurement decision because the bases for the ratings are well documented and were themselves considered as part of the tradeoff process. See Wackenhut, 85 Fed. Cl. at 297 (citing Opti-Lite Optical, 1999 WL 152145, at *3 (Comp. Gen. 1999)) ("[A]djectival ratings and point scores are useful as guides to decision-making . . . but [] must be supported by documentation of the relative differences between the proposals, their strengths, weaknesses and risks, and the basis and reasons for the . . . decision."). Tapestry's challenge based on the agency's reliance upon adjectival ratings in making its tradeoff decision therefore lacks merit.

### ii.     Ignoring "Marginal" ratings assigned to other offerors

Tapestry also contends that the Agency's tradeoff analysis was flawed because the SSA allegedly ignored the "Marginal" ratings assigned to ASG, Innoplex, and Synergy for one of the problem statements. Tapestry MJAR at 30–31. This argument is contradicted by the record, which reveals that the agency evaluated, considered, and weighed the three "Marginal" ratings in accordance with the Solicitation. AR Tab 65 at 4659.13–.16 (agency analysis of Innoplex); id. at 4659.37–.38 (agency analysis of Synergy); id. at 4659.41–.44 (agency analysis of ASG). For each evaluation, the SSA acknowledged the "Marginal" ratings but found nonetheless that any risk would be mitigated by competition at the task order level. See AR Tab 65 at 4659.16 ("I recognize risk in the 'Marginal' rating for [Innoplex], but it will be mitigated to an acceptable level through the task order competition."); id. at 4659.38 ("The risk of unsuccessful performance [by Synergy reflected by] the 'Marginal'[] rating [is] mitigated by the number of awardees and the competition at the Task Order level."); id. at 4659.44 ("The risk of unsuccessful performance [by ASG] associated with the 'Marginal' rating is mitigated by the number of awardees and the competition at the Task Order level."). Tapestry's mere disagreement with how the agency weighed the risk associated with these "Marginal" ratings against the lower risk associated with their higher ratings on more important evaluation factors does not provide a basis for sustaining this protest ground.

### iii.       Inadequate consideration of price

Finally, Tapestry argues that the SSA's best value tradeoff analysis was flawed because he only considered price as a nominal factor and was willing to pay an "enormous price premium[] despite a lack of commensurate technical benefit." Tapestry MJAR at 32. Tapestry also argues that the Agency's entire price reasonableness methodology was flawed because it "ensured that almost no price could be too high to receive an award." Id. at 35.

The Court is unconvinced by these arguments for the reasons it set forth above in dealing with the similar arguments pressed by DVS. It was within the agency's discretion to determine how much of a price premium it was willing to pay in light of the perceived benefits of each proposal. The SSA acknowledged Tapestry's low price and its attractive past performance record, but concluded that the price savings did not justify making an award to a proposal that was relatively unimpressive with respect to Factor 1. AR Tab 65 at 4659.97. It was not unreasonable for the agency to find that Tapestry's low price was outweighed by the shortcomings in its technical evaluation or that the higher prices of the successful offerors were offset by the technical benefits they could provide. See Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 201–02 (2019) (quoting Serco, 81 Fed. Cl. at 497) (observing that "logic suggests that as [the magnitude of a price difference between two proposals] increases, the relative benefits yielded by the higher-priced offer must also increase"); Technatomy Corp., B-414672.5, 2018 WL 5292575, at *15 (Comp. Gen. Oct. 10, 2018) ("Where [] a solicitation provides that technical factors are more important than price in source selection, selecting a technically superior, higher-priced proposal is proper where the agency reasonably concludes that the price premium is justified in light of the proposal's technical superiority . . . [as] supported by a rational explanation."). Tapestry's objections to the way that the agency took price into consideration are therefore rejected.

### e.       Innoplex's proposal

Finally, Tapestry contends that Innoplex's proposal received an unfair competitive advantage because, according to Tapestry, it violated the provision in the Solicitation which provided that "page limitations may not be circumvented by including inserted text boxes/pop-ups or internet links to additional information." Tapestry MJAR at 38–39 (citing AR Tab 5 at 370). Even if such a violation occurred, Tapestry has not established that it was prejudiced by it. Further, offerors were permitted to use font sizes as small as six-point type for "tables, charts, graphs and figures." AR Tab 5 at 371. The Court has reviewed the pages in Innoplex's proposal that Tapestry cites and concluded that what Tapestry characterizes as text boxes could also reasonably have been deemed by the agency to be tables, charts, graphs, or figures. See Tapestry MJAR at 39 (citing AR Tab 142 at 17439, 17440, 17442, 17443, 17445, 17447, 17448, 17449, 17450, 17451, 17452, 17453, 17455, 17456, 17457).

### E.       CollabraLink Technologies, Inc. (Case No. 19-1178C)

### 1.       The Agency's Evaluation

CollabraLink Technologies, Inc. ("CollabraLink") submitted its proposal on April 4, 2017. AR Tab 135 (CollabraLink proposal). The proposal was assigned six strengths and no

weaknesses under Factor 1. AR Tab 65d at 4910–11. For Factor 3, Problem Statement No. 3, CollabraLink was assigned two strengths and no weaknesses. Id. at 4914. For Factor 3, Problem Statement No. 4, CollabraLink earned two strengths, which were offset by one weakness and one significant weakness. Id. at 4915–16. For Factor 4, CollabraLink received six strengths and no weaknesses. Id. at 4917–18.

The agency assigned CollabraLink's proposal the following adjectival ratings:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Satisfactory | Good | Marginal | Outstanding |

Id. at 4919; AR Tab 65e at 5843–45 (SSAC memorandum). CollabraLink's evaluated price was ranked [***]. AR Tab 65e at 5843.

The SSAC observed that CollabraLink's proposal "was priced in the upper half of all of the Offerors" and "was not one of the highest technically rated." AR Tab 65e at 5845. It therefore recommended against awarding a contract to CollabraLink. Id. The SSA agreed and CollabraLink was not selected as an awardee. AR Tab 65 at 4659.70–.72.

## 2.    CollabraLink's Protest

In its amended MJAR, CollabraLink challenges several aspects of the agency's evaluation. It contends that the agency failed to follow the Solicitation's ratings criteria when it assigned a "Good" rather than "Outstanding" rating under Factor 1. Pl.'s Mem. in Support of its Am. Mot. for J. on the Admin. R. ("CollabraLink MJAR") at 12, ECF No. 104. It further argues that there is insufficient documentation in the record to explain why the agency downgraded to "Marginal" its rating for Factor 3, Problem Statement No. 4. Id. at 24. Finally, in arguments reminiscent of those pressed by DVS, CollabraLink contends that the agency's best value tradeoff analysis was "based exclusively on adjectival ratings and did not account for the underlying relative technical merit (e.g. Strengths and Weaknesses) of the proposals," and that the agency failed to meaningfully consider price. Id. at 29–30, 35. These contentions lack merit.

### a.    Rating for Factor 1

As discussed above, under the Solicitation, a proposal may be assigned a "Good" rating under Factor 1 where: 1) it "addresses all Innovation elements and indicates a thorough approach and understanding of Innovation"; 2) its strengths "outweigh any weaknesses"; and 3) the "[r]isk of unsuccessful performance is low." AR Tab 5 at 387–88. The criteria for assigning an "Outstanding" rating for Factor 1, on the other hand, require that: 1) the proposal must "address[] all Innovation elements and indicate[] an exceptional [as opposed to merely "thorough"] approach and understanding of Innovation"; 2) the proposal's strengths must "far outweigh" weaknesses; and 3) the "[r]isk of unsuccessful performance" by the offeror must not only be "low"—it must be "very low." Id. at 387.

CollabraLink argues that it was arbitrary, irrational, and contrary to the Solicitation for the agency to assign it a "Good" rather than "Outstanding" rating for Factor 1. CollabraLink MJAR at 13. It contends that an "Outstanding" rating was required because its six strengths "far outweigh[ed]" its weaknesses (of which there were none). Id. (citing AR Tab 5 at 387).

These contentions lack merit. Even assuming that Collabralink's strengths can be characterized as "far outweigh[ing]" its weaknesses, an "Outstanding" rating under Factor 1 also requires that a proposal have an "exceptional approach and understanding of Innovation" and that the offeror's risk of failure be "very low." AR Tab 5 at 387. The agency determined that CollabraLink's proposal did not surpass these thresholds. AR Tab 65d at 4912. As the agency explained to CollabraLink during its debriefing, "[t]he evaluation board for Factor 1 determined that [CollabraLink's] proposal addressed all innovation elements and indicated a thorough approach and understanding of innovation" but, after "t[aking] all strengths into consideration . . . did not conclude that the Factor 1 proposal indicated an exceptional approach and understanding of innovation." AR Tab 101 at 8995 (CollabraLink debriefing Q&A response).

CollabraLink contends that it was arbitrary for the agency to find that its approach and understanding were merely "thorough" and not "exceptional," AR Tab 5 at 387, because the agency characterized five of the six strengths it earned as having "the potential to yield the most valuable and beneficial results" to the agency, AR Tab 65 at 4659.68. CollabraLink notes that it was assigned more strengths that had this potential than seven of the awardees who were rated "Outstanding." CollabraLink MJAR at 15. CollabraLink further notes "eight other awardees who received 'Outstanding' ratings in Factor 1 were found to have the same number of Most Valuable and Beneficial Strengths as CollabraLink—five." Id. at 16.

CollabraLink's reliance on the number of "Most Valuable and Beneficial Strengths" it was assigned is misplaced for a number of reasons. Id. For one thing, as the table in CollabraLink's MJAR shows, all of the awardees who received "Outstanding" ratings had more than the six strengths CollabraLink's proposal earned—indeed, their average number of strengths (approximately twelve) was twice the number assigned to CollabraLink. Id. at 17. Further, while the Solicitation distinguished between weaknesses that were "significant" and those that were not, it made no distinction among strengths based on which had the "potential to yield the most valuable and beneficial results." AR Tab 65d at 4911; AR Tab 65 at 4659.68.[12]

CollabraLink theorizes that the basis for identifying which strengths have the "potential to yield the most valuable and beneficial results" may be divined from an evaluation worksheet

---

[12] The five strengths in CollabraLink's proposal which the agency characterized as having the potential to yield the most valuable and beneficial results were: 1) the proposal's "clear, concise, and well detailed" showing concerning "how [its] core competencies of Innovation align with DISA's mission needs and operating principles"; 2) its description of [***]; 3) its "detailed [knowledge management] methodology"; 4) its description of "a clear track record of developing solutions and successfully sustaining the solutions from infancy to full maturity"; and 5) its [***]. AR Tab 65d at 4910–11. The sixth strength CollabraLink earned, which was not characterized as having the potential to yield the most valuable and beneficial results, was its [***]. Id. at 4911.

prepared by the SSEB Chair. <u>See</u> CollabraLink MJAR at 15. According to CollabraLink, the worksheet reveals that "the SSEB Chair thought that some Strengths assigned to offerors under Factor 1 were 'At Risk Strengths' because they aligned with 'Core Competency' requirements of the Solicitation." <u>Id.</u> Therefore, CollabraLink states, the SSEB Chair created a chart which took the total number of strengths assigned (six in CollabraLink's case) and subtracted from it the number of so-called "Competency Strengths" (one) with the difference representing the "most valuable and beneficial" strengths. <u>Id.</u> (citing AR Tab 173).

The Court does not find CollabraLink's explanation of the worksheet helpful. The worksheet is entitled "Factor 1: Innovation→At Risk Strengths." AR Tab 173 at 29853. It is not comprehensive; in fact, it covers only twenty-nine of the ninety-nine proposals the agency evaluated. <u>Id.</u> For each proposal the spreadsheet includes a column labelled "Current Counts," which appears to reflect the number of strengths, weaknesses, significant weaknesses, and deficiencies assigned by the IEB. <u>Id.</u> Another column is entitled "Counts w/ Competency Strength Removed." <u>Id.</u> CollabraLink's view is that the table distinguishes between so-called "competency" strengths and strengths that "have the potential to yield the most valuable and beneficial results." CollabraLink MJAR at 15.

But CollabraLink's theory raises more questions than it answers, including what it means for a strength to be "At Risk" or to be a "core competency" strength and why the latter strengths would categorically not have the potential to yield the most valuable and beneficial results. <u>Id.</u> Moreover, CollabraLink's entire theory is undermined by its acknowledgements that the worksheet "appears to be only a preliminary analysis because it does not analyze all Factor 1 proposals," and that "many of the 'most valuable and beneficial' Strengths counts in the SSAC and SSDD Reports are different than the Strength 'Counts w/ Competency Strengths Removed' in the SSEB Chair's worksheet." <u>Id.</u> at 15 n.3 (citing AR Tab 173 at 29853; AR Tab 63 at 4570–651; AR Tab 65 at 4659.6–.96).

In any event, "a qualitative evaluation of proposals is not governed by a simple count of strengths and weaknesses." <u>N. S. Consulting Grp., LLC v. United States</u>, 141 Fed. Cl. 549, 557 (2019); <u>see also</u> LOUI Consulting Grp., Inc., B-413703.9, 2017 CPD ¶ 277 (Comp. Gen. Aug. 28, 2017) ("[T]he evaluation of quotations and assignment of adjectival ratings should generally not be based upon a simple count of strengths and weaknesses, but on a qualitative assessment of the quotations consistent with the evaluation scheme."). And an agency has "broad discretion to weigh an offeror's strengths and weaknesses as it sees fit." <u>Tetra Tech, Inc. v. United States</u>, 137 Fed. Cl. 367, 386 (2017). Therefore, CollabraLink cannot establish that the agency acted irrationally when it did not give dispositive weight to the number of strengths each offeror earned that were deemed to have "the potential to yield the most valuable and beneficial results."

There is similarly no merit to CollabraLink's argument that the agency's Factor 1 evaluation was "manifestly unreasonable" because CollabraLink earned an "Outstanding" rating under Factor 4, where it earned the same number of strengths (six) and weaknesses (zero). CollabraLink MJAR at 13–14. <u>See</u> Wellpoint Military Care Corp., B-415222.5, 2019 CPD ¶ 168 (Comp. Gen. May 2, 2019).

Moreover, there are material differences between the criteria for assigning adjectival ratings under Factors 1 and 4. The adjectival rating assigned under Factor 4 does not depend

upon the number of strengths and weaknesses assigned or the balance between the two. See AR Tab 5 at 392. Instead, under Factor 4 the ratings are based on the quality of the proposal's "approach and understanding of the small business objectives," i.e., whether that approach and understanding is "thorough" or "exceptional." Id. There is therefore no inconsistency between the agency's assignment of ratings to CollabraLink's proposal under Factors 1 and 4.

Finally, CollabraLink contends that the SSEB Chair's worksheet shows that he recommended a rating change under Factor 1 to "Purple/Blue" i.e., "Good/Outstanding," but that the final SSEB report did not reflect this recommendation. CollabraLink MJAR at 18 (citing AR Tab 173 at 29853). But it is unclear to the Court what a "Purple/Blue" designation signifies. AR Tab 173 at 29853. Presumably it means that the SSEB Chair concluded that it was a close call whether to rate the proposal "Good" or "Outstanding." Further, the worksheet does not reflect a recommendation that CollabraLink's rating be changed; the table lists a "Purple/Blue" rating in both the "Current Counts" column and the "Rating Change" column. Id.

In short, the agency's decision to assign CollabraLink's Factor 1 proposal a "Good" rating was reasonable and adequately documented. CollabraLink's protest based on its Factor 1 rating therefore lacks merit.[13]

### b.    Factor 3, Problem Statement No. 4 Rating

CollabraLink's next contention is that the Agency made a "clear error" in assigning it a "Marginal" rating under Factor 3 for Problem Statement No. 4. Specifically, it contends that "the record unambiguously shows that the PSEB rated CollabraLink's [Problem Statement No. 4] proposal as 'Acceptable' and that the 'SSEB concurred' with this finding." CollabraLink MJAR at 24. The Court disagrees with CollabraLink's interpretation of the record.

The Solicitation states that a "Marginal" rating may be assigned to a problem statement where a proposal: 1) "does not clearly meet [the] requirements and has not demonstrated an adequate approach and understanding of the requirements"; 2) "has one or more weaknesses which are not offset by strengths"; and 3) reflects a high risk of "unsuccessful performance." AR Tab 5 at 391. An "Acceptable" rating indicates that a proposal: 1) "meets requirements and indicates an adequate approach and understanding of the requirements"; 2) possesses strengths and weaknesses that "are offsetting or will have little or no impact on Contract performance"; and 3) reflects a risk of "unsuccessful performance [that] is no worse than moderate." Id.

---

[13] In its MJAR, CollabraLink presses a disparate treatment argument that is derivative of its argument that it should have been assigned an "Outstanding" rating for Factor 1. CollabraLink MJAR at 22. It claims unequal treatment based on the fact that it earned more strengths that the agency characterized as potentially yielding the most valuable and beneficial results than seven offerors who received an "Outstanding" rating. CollabraLink's disparate treatment argument fails because, as shown above, the number of strengths and weaknesses assigned to a proposal was not the determinant of its adjectival ratings. Further, the proposals themselves are materially different.

CollabraLink is correct that the PSEB Consensus Report states that it assigned CollabraLink an "Acceptable" rating for Problem Statement No. 4. AR Tab 172 at 29552. This rating is consistent with the narrative in the Consensus Report, which stated that the "[p]roposal meets requirements and indicates an adequate approach and understanding of the requirements," and that the "two strengths, one significant weakness, and one weakness are offsetting." Id.

CollabraLink is also correct that the SSEB report incorrectly represented that the PSEB's final rating for Problem Statement No. 4 was "Marginal." AR Tab 61 at 3699.[14] But this error is of no moment because the SSEB report states that its final rating for Problem Statement No. 4 was "Marginal" and, most significantly, provides a narrative that is consistent with a "Marginal" and not an "Acceptable" rating. Id. (stating that "[p]roposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements," that "[t]he proposal contained two (2) strengths, one (1) significant weakness, and one (1) weakness, but considering the specific strengths, weakness, and significant weakness, the weakness and significant weakness are not offset by the strengths," and that "the overall risk of unsuccessful performance is high"). The "Marginal" rating was then reflected in the SSAC and the SSA reports. AR Tab 63 at 4627; AR Tab 65 at 4659.70.

To be sure, there is nothing in the SSEB report which reflects that it understood that the "Marginal" rating it assigned was a change from the rating the PSEB assigned. But the "Marginal" rating is, as noted, supported by the narrative in the SSEB report. Indeed, CollabraLink does not even argue that it was entitled to an "Acceptable," rather than a "Marginal" rating for Problem Statement No. 4. Whatever error the SSEB made by inaccurately recording the PSEB's rating for Problem Statement No. 4 is therefore a harmless one that does not undermine the rationality of the agency's final rating decision.

### c.        The Agency's Best Value Tradeoff Analysis

The grounds upon which CollabraLink challenges the agency's best value tradeoff analysis are similar to those presented by Tapestry and DVS. It argues that DISA's best value analysis was flawed because it relied exclusively on adjectival ratings without considering the underlying technical merits of the proposals. CollabraLink MJAR at 30. It further contends that the agency did not adequately compare proposals and failed to meaningfully consider price. Id. at 30, 35.

---

[14] The Court notes that the SSEB Chair's worksheets characterize the PSEB's rating inconsistently. A PSEB rating for Problem Statement No. 4 of "Acceptable" is reflected at AR Tab 173 at 29850. The rating for the same problem statement is elsewhere recorded as "Marginal." Id. at 29841. The Court is not sure what to make of the worksheets. It notes, however, that the worksheet which reflects a "Marginal" rating contains a remark which states that the two strengths it received under Problem Statement No. 4 "may not offset" the one weakness and one significant weakness. Id. This suggests to the Court that the Chair may have been explaining why it was necessary to assign a lower rating for Problem Statement No. 4 than the "Acceptable" rating the PSEB assigned.

As the Court has explained, the agency is entitled to great deference when it decides which proposals reflect the best value to the government. Further, the Court has already addressed at length and rejected the kind of generic arguments that CollabraLink makes regarding whether the agency gave appropriate consideration to price and/or whether it relied excessively on adjectival ratings. Therefore, the Court concludes that CollabraLink's arguments provide no basis for overturning the agency's conclusion that it was not entitled to receive an award.

### F.   Sealing Technologies (Case No. 19-1296)

#### 1.   The Agency's Evaluation and Award Decision

##### a.   Initial Evaluation

Sealing Technologies, Inc. ("Sealing") submitted its proposal to DISA on April 4, 2017. AR Tab 154. The IEB assigned the proposal five strengths and two weaknesses under Factor 1, which resulted in an overall rating of "Good." AR Tab 65d at 5542–44. For Factor 2, the PPEB found "Not Relevant" two of the three past performance references Sealing submitted. Id. at 5545. It concluded that Sealing had not complied with the Solicitation's instructions to supply task order numbers for references that involved performance under an IDIQ contract. Id. The third reference was found "Somewhat Relevant" and assigned a quality rating of "Very Good." Id. The PSEB assigned the proposal three strengths, two weaknesses, and one significant weakness under Problem Statement No. 3, which resulted in a "Marginal" rating, id. at 5546–47, and one strength and no weaknesses for Problem Statement No. 4, which earned it a "Good" rating, id. at 5547–48. Finally, under Factor 4, Sealing received an "Outstanding" rating based on the assessment of six strengths and no weaknesses. Id. at 5549–50.

Upon review, the SSEB made one change to the ratings the TEBs assigned, downgrading Sealing's rating for Problem Statement No. 4 from "Good" to "Acceptable." Id. at 5548. The SSEB explained that although Sealing's response to Problem Statement No. 4 earned one strength and no weaknesses, "when considering the entire proposal for this factor . . . , the proposal did not demonstrate more than an adequate approach and understanding of the Government requirement for this evaluation factor." Id.

Sealing's final ratings as ratified by the SSA were as follows:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | Neutral | Marginal | Acceptable | Outstanding |

AR Tab 65 at 4659.86.

Sealing's proposed price was [***], which was the [***] out of the ninety-nine proposals. Id. The SSA agreed with the SSAC recommendation not to award Sealing a contract on the grounds that the "proposal was priced in the upper half of all of the Offerors" and "was not one

of the highest technically rated proposals," and so did "not represent a best value to the Government." AR Tab 65 at 4659.88–.89.

### b.      Remand

After this protest was filed, the agency requested and the Court granted a remand of Sealing's protest, among others, to consider whether it erred 1) "in its application of the Solicitation's criteria with regard to Problem Statement No. 3"; and 2) in finding two of Sealing's past performance references "Not Relevant" under Factor 2. AR Tab 174 at 30001 (SSA decision on remand).

On remand, the SSA reversed its earlier decision to assign a weakness and a significant weakness to Sealing's responses to Problem Statement No. 3 and upgraded its rating for that problem statement from "Marginal" to "Acceptable." Id. at 30012. On the other hand, the SSA sustained the agency's original decision finding the past performance references non-compliant with the Solicitation and therefore not relevant. Id. at 30010.

Notwithstanding the upward rating adjustment for Problem Statement No. 3, the agency again concluded that Sealing should not receive a contract award. Id. at 30012 (observing that Sealing's proposal "[was still not] amongst the most highly rated or the lowest priced and does not represent a best value to the Government"). The agency further stated that even if it assumed that one of Sealing's past performance references was relevant, and raised its Factor 2 rating to "Satisfactory," it would still not have selected Sealing for an award. Id. at 30012. Thus, the agency reaffirmed its initial determination that "Sealing Tech's proposal d[id] not merit selection for award." Id.

As a result of the agency's review on remand, Sealing's final ratings are as follows:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Good | **Neutral** [also considered as Satisfactory] | Acceptable | Acceptable | Outstanding |

Id. at 30010.

### 2.      Sealing's Protest

### a.      Alleged Errors in Factor 1 Evaluation

Sealing contends that the agency committed several errors in conducting its evaluation of Sealing's proposal under Factor 1. For the reasons set forth below, the Court concludes that Sealing's arguments lack merit.

i.      **Weakness regarding measuring the effectiveness of innovation efforts**

Under the "Corporate Philosophy/Culture on Innovation" aspect of Factor 1, the Solicitation required offerors to explain: "How [they] assess Innovation? Measure it? Track it?" and "What are the methods for measuring the effectiveness of Innovation efforts?" AR Tab 5 at 377. DISA concluded that Sealing's proposal "does not showcase an adequate method for measuring the effectiveness of Innovation efforts" and assigned it a weakness on that basis. AR Tab 65d at 5543. This "flaw," the agency explained, increased the risk that Sealing would fail to innovate "because an Offeror without a clear method for measuring the effectiveness of innovation efforts is less likely to succeed in performing SETI tasks that require mature and detailed measures to manage complex system development in future SETI task orders." Id. at 5543–44.

Sealing challenges the assignment of this weakness on several interrelated grounds. First, Sealing complains that the Solicitation did not set forth any metrics or standards for determining the adequacy of an offeror's proposed method for measuring the effectiveness of innovation. Pl. Sealing Technologies Inc. 2d Am. Mot. for J. on the Admin. R. & Supp. Mem. of Law at 3 ("Sealing MJAR"), ECF No. 102. Therefore, it contends, the agency improperly relied on "[u]nstated [e]valuation [c]riteria," id., when it assigned the proposal a weakness for failing to "showcase an adequate method for measuring the effectiveness of innovation efforts," id. (quoting AR Tab 65d at 5543–44).

This line of attack fails. While it is well established that an agency is required to evaluate proposals based only on the criteria stated in the Solicitation, to show a violation of that requirement a protester must demonstrate, among other things, that the agency "used a significantly different basis in evaluating the proposals than was disclosed." Wellpoint Military Care Corp. v. United States, 144 Fed. Cl. 392, 404 (2019), aff'd, 953 F.3d 1373 (Fed. Cir. 2020) (citing Academy Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 470 (2009)). Here, as noted, the Solicitation instructed offerors to describe how they assessed, measured, and tracked innovation and also to state "the methods for measuring the effectiveness of Innovation efforts." AR Tab 5 at 377. It could therefore have been no surprise to Sealing that the agency would evaluate its proposal to judge the quality of those methods.

Indeed, the Court concludes that Sealing's quarrel is not really with the use of unstated evaluation criteria, but with the agency's explanation of why it found inadequate Sealing's description of its method for measuring the effectiveness of innovation efforts. In fact, the thrust of the arguments in Sealing's MJAR is that—contrary to the agency's view—its proposal "clearly" included "a thorough and systemic approach for measuring the effectiveness of Innovation efforts." Sealing MJAR at 4. In other words, Sealing challenges the reasonableness of the agency's determination that its proposal did not include the kind of "mature and detailed measures" needed "to manage complex system development in future SETI task orders." Tab 65d at 5543–44.

As this Court has noted, the scope of its review of this kind of exercise of technical judgment is extremely narrow. See E.W. Bliss Co., 77 F.3d at 449 (stating that "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary

determinations of procurement officials that a court will not second guess"). The Court's job is not to decide whether or not Sealing's proposal "showcase[d] an adequate method for measuring the effectiveness of Innovation efforts." AR Tab 65d at 5543. It is instead to determine whether the agency had a rational basis for its decision that the methods Sealing proposed were not adequate. And so long as the result the agency reached is not an irrational one, and that "the agency's path" to that result "may reasonably be discerned," the agency's determination must be upheld. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Bowman Transp., 419 U.S. at 286).

The agency's decision here passes this modest test. As explained in its proposal, Sealing's method of measuring the effectiveness of innovation efforts focuses on the [***]. AR Tab 154 at 23831. The proposal stated that the [***]. Id. "[***]," the proposal states, "[***]." Id. Further, [***]. Id. [***]. Id.

The agency's conclusion that Sealing's methodology was not "mature and detailed" enough to "manage complex system development in future SETI task orders" is facially rational. AR Tab 65d at 5544. Sealing's proposal emphasizes the procedures that it uses when tracking its innovation efforts, but does not offer much explanation regarding what metrics, if any, it uses to measure their effectiveness.

Sealing observes that the agency assigned a strength to awardee Innoplex's proposal where it also [***]. Sealing MJAR at 8. Therefore, Sealing argues, assigning its proposal a weakness reflects disparate treatment.

But the two proposals are clearly distinguishable, notwithstanding that both mention the [***]. Innoplex received a strength for its "comprehensive approach to assessing innovation, and measuring the effectiveness of those innovation efforts." AR Tab 65d at 5152. The agency explained that Innoplex's [***]. Id.; see also AR Tab 142 at 17444 (Innoplex proposal) (describing [***], see id. at 17440–42).

In short, Sealing's attack on the agency's decision to assign it a weakness lacks merit. Its contention that the agency's evaluation of its proposal in this regard reflected disparate treatment is even less persuasive. Its remaining arguments regarding the agency's evaluation of its methodology for measuring the effectiveness of innovation have been considered, and the Court finds them unpersuasive. Therefore, the Court rejects Sealing's argument that it should have received a strength rather than a weakness for this aspect of its proposal.

ii.     **The agency's failure to assess a strength to Sealing for its physical and virtual investment in laboratory/testing spaces**

Under the Physical Investment/Dedicated Resources/[]Virtual[] Investment aspect of the Factor 1 evaluation criteria, the Solicitation required offerors to describe their "physical investment in Laboratory/Testing space." AR Tab 5 at 377. They were also instructed to "[d]escribe the size, locations and uses of these spaces in detail." Id. In addition, offerors were directed to "[d]escribe other dedicated resources available to the company, their size, location and uses of the resources." Id. Offerors were permitted to "include employees whose main job is invention/Innovation" among the resources

identified. Id. In addition, they were advised to describe, if applicable, "the company's 'Virtual Investment' such as cloud technology for 'lab space' and monetary investment of non-physical assets or virtual models." Id.

Sealing claims that the agency engaged in disparate treatment when it assigned a strength to BCMC's proposal based on its response to this prompt, but did not similarly assign a strength to Sealing's proposal. Sealing MJAR at 9. According to Sealing, its proposal described a laboratory similar to BCMC's that had a similar capability. Id. Sealing's observations and assertions do not establish disparate treatment.

Sealing's proposal states that it [***]. AR Tab 154 at 23833. [***]. Id. The proposal states that [***]. Id. Further, the proposal notes that [***]. Id. In addition, Sealing stated, [***]. Id. The proposal further [***]. Id. Finally, the proposal [***]. Id.

In its proposal, BCMC explains that [***]. AR Tab 132 at 13106. The proposal [***]. Id. BCMC notes that [***]. Id. at 13107. Its proposal also [***]. Id.

The agency assigned BCMC a strength for this aspect of its proposal because it [***]. AR Tab 65d at 4837. DISA explained that BCMC's [***]. Id. at 4838.

As is readily apparent, the features of the labs described in the proposals are different. Sealing's argument focuses on some of the high-level similarities between the proposals—i.e., [***]. The gravamen of its argument is that the differences between the features of the labs are not material and that if a strength was assigned to one proposal, it was irrational not to assign it to the other. But Sealing does not contend that the features of the labs are substantively indistinguishable. Therefore, the Court cannot "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." Office Design Grp., 951 F.3d at 1373. And to state the obvious, the Court lacks the technical expertise to pass judgment as to the relative value of the labs anyway. Sealing's disparate treatment argument must therefore be rejected.

### iii.      Agency's failure to assess a strength for Sealing's Innovation Council

Sealing alleges that it was arbitrary for the agency to assign NetCentric a strength based on its proposal to use a [***]. Sealing MJAR at 12. This contention lacks merit for any number of reasons, including that the purposes of the [***] appear to be different, and that NetCentric provided a far more detailed description of the work of its [***].

Sealing's proposal, as noted, includes [***]. According to the proposal, its [***]. AR Tab 154 at 23831. [***]. Id. It [***]. Id. at 23831–32. It also [***]. Id. at 23832.

NetCentric described [***]. AR Tab 150 at 21353. [***]. Id. at 21353–54. [***]. Id. [***]. Id. at 21354. [***]. Id.

The agency assigned a strength to this aspect of NetCentric's proposal. It concluded that [***]. AR Tab 65d at 5359.

The description of tasks performed by NetCentric's [***] highly detailed. NetCentric's proposal shows that [***]. The discussion of Sealing's [***] is less extensive and, more importantly, Sealing's [***]. See AR Tab 154 at 23831. The proposals are not substantively indistinguishable. The agency's decision to assign a strength to NetCentric's proposal, but not to Sealing's, is facially rational and Sealing's disparate treatment argument lacks merit.

### b.        Alleged Errors in Factor 2 Evaluation

In its initial evaluation, DISA designated two out of Sealing's three past performance references "Not Relevant" because for each one Sealing had been a major subcontractor on IDIQ contracts and had listed the entire contracts as references rather than specifying a particular task order on which it had performed work. AR Tab 65d at 5545; AR Tab 174 at 30047. Sealing's proposal did not comply with the directions in the Past Performance Questionnaire requesting that offerors "include task number if applicable." AR Tab 1 at 147 (§ I, no. 3). Further, by referring to the entire IDIQ contract, Sealing's past performance references defied the explicit warning in the Solicitation that "Individual Task Orders under an ID/IQ Contract are each considered to be one past/present performance effort." AR Tab 5 at 379. In fact, during the question and answer period, the agency responded "no" when an offeror asked whether the government would "consider allowing an offeror who is the only prime on a single award ID/IQ to use the ID/IQ contract rather than individual task/delivery orders?" Id. at 343 (no. 379). Because Sealing failed to comply with these requirements as to its first two references, the PPEB stated, it "was unable to determine the scope and level of effort involved in an individual task order." AR Tab 171 at 29214, 29216.

As noted above, at the government's request, this Court remanded Sealing's protest to consider whether the agency erred in not evaluating the two past performance references. AR Tab 174 at 30001. Specifically, DISA explained that "[b]ecause the non-compliant past performance submissions w[ere] signed by DISA personnel," it had decided "to reassess the past performance rating as information that may have been close at hand to DISA at the time of past performance evaluation." Id. at 30002; see Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 163 (2005) (observing that "some [past performance] information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain and consider the information") (quoting Int'l Bus. Sys., Inc., B-275554, 97-1 CPD ¶ 114, at 4 (Comp. Gen. Mar. 3, 1997))).

For the first reference, the CO conducted a search using the IDIQ number Sealing provided. Id. at 30047. That search yielded some 12,396 "actions" issued pursuant to the base IDIQ contract. Id. The CO concluded that "[w]hile not all actions were direct delivery orders" it was "not practicable to locate the needle in a haystack task order to which Sealing Tech's past performance submission referred." Id. He further explained that "it would be difficult to determine which of the delivery orders was at issue particularly where the reference pointed to a subcontracted piece." Id. Thus, the CO could not make a relevancy or quality assessment of Reference 1. Id. The reference therefore retained its "Not Relevant" rating. Id.

The Past Performance Questionnaire for Sealing's second reference, as noted, was prepared by a DISA employee for a DISA contract. Id. The CO searched the DISA contract writing system using the IDIQ number Sealing provided, which produced 806 associated

documents and twenty-two different task orders. Id. The CO could not determine the relevant task order number based on this search, so he went further by asking the DISA employee who completed the Past Performance Questionnaire for more information. Id. 30047–48. That individual apparently based the evaluation in the Past Performance Questionnaire upon Sealing's performance on several task orders as she "provided three different contracts/orders/tasks that she associated with her assessment of Sealing Tech." Id. The Solicitation provided, however, that offerors were to submit past performance references for no more than three recent contracts/orders. AR Tab 5 at 379. The agency therefore again found the reference non-compliant. AR Tab 174 at 30048. It noted that it would be unfair to consider this reference because the limitation on the number of references "was enforced across all offerors and none were permitted to have multiple references considered." Id. The agency reaffirmed the rating of "Neutral Confidence" for Factor 2. Id. at 30048–49.

Sealing argues that the agency did not need the task order numbers to evaluate its references because "the bulk of what the Agency needed to evaluate SealingTech's past performance was located in the substance of the proposal, not the reference number." Sealing MJAR at 20–21. The government responds that—under the reasoning of Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007)—it is too late for Sealing to argue that the requirement that it provide task order numbers was unnecessary. Gov't MJAR at 100–01. Further, the government cites the court's decision in By Light Prof'l IT Servs. V. United States, 131 Fed. Cl. 358, 368 (2017), rejecting a similar argument on the merits. Id. at 101.

The Court rejects the government's waiver argument. The Solicitation states that "[n]on-conformance with the instructions provided in this Information to Offerors may result in removal of the proposal from further evaluation." AR Tab 5 at 367. The Court does not understand Sealing to be challenging the Solicitation's requirement that a task order number be supplied with the past performance reference, but rather the reasonableness of the agency's decision to designate its references "Not Relevant" solely because it did not comply with that requirement.

Here, the Court concludes that it was reasonable for the agency to determine that—without the task order numbers—it could not complete its evaluation of the past performance reference. Among other things, it could not confirm the scope and level of effort involved in the performance example, whether the example involved the entire IDIQ contract (which would be impermissible), or whether it represented work performed on more than one task order (which is also impermissible). Indeed, as the agency discovered on remand, the Past Performance Questionnaire completed for reference two did, in fact, involve more than one task order.

The agency required offerors to provide task order numbers to facilitate its review of the past performance references the offerors submitted. Sealing failed to comply with that requirement. After initially rating the references "Not Relevant" based on Sealing's non-compliance, the agency took a second look and was still unable to confirm to which task order or orders References 1 and 2 pertained. The Court concludes therefore that the agency acted within its discretion when it found those references non-compliant with the Solicitation and treated them as "Not Relevant." Sealing's challenge to its "Neutral" rating for Factor 2 is therefore without merit.

c.      **Problem Statement No. 3: Weakness Regarding Risk
        Management**

Sealing's second challenge to its "Marginal" rating on Problem Statement No. 3 concerns
the agency's decision to assign it a weakness based on flaws in its approach to risk management.
The Solicitation required offerors to submit a "Risk Management Plan" ("RMP") that explained
how the offeror would "mitigate uncertainties that include, but are not limited to, unknown
conditions, revised mission requirements, Innovation risk, [and] schedule risks," as well as "cost
and time growth" that may result from such uncertainties. AR Tab 5 at 381. Offerors were also
instructed to discuss how they planned to mitigate delays from unforeseen problems and make up
time to complete the project by the scheduled completion date. Id. In addition, offerors were
required to identify risks that could delay or hinder completion of the project and to propose
mitigation measures to address those risks. Id.

The PSEB assigned a weakness to Sealing's RMP. It observed that in its response to
Problem Statement No. 3, AR Tab 154 at 23881, Sealing had "described an approach to risk that
differs from traditional risk management methods," but that it "did not discuss what the
mitigations would be for the risks that [it] identified," AR Tab 65d at 5546. In its MJAR, Sealing
challenges the accuracy of the agency's assertion, referencing the [***] it included in its
proposal. Sealing MJAR at 25.

The Court is not persuaded that the agency lacked a rational basis for assigning the
weakness at issue. Sealing's proposal identified the following risks: [***]. AR Tab 154 at 23881.
The risk descriptions set forth in the tables contained in Sealing's proposal do not identify any of
these circumstances as risks, and therefore do not include strategies to mitigate those risks. And
Sealing fails to explain either in its proposal or its MJAR how the risk descriptions in the table
correspond to the risks it identified in its proposal. The Court therefore lacks any grounds for
finding that the agency's decision to assign a weakness to the proposal lacks a rational basis.

d.      **Problem Statement No. 4**

The PSEB assigned Sealing a rating of "Good" for Problem Statement No. 4, on the
grounds that its response demonstrated a "thorough" approach and understanding of
requirements. AR Tab 65d at 5547–48. The SSEB, however, downgraded the rating to
"Acceptable." Id. at 5548. It acknowledged that the one strength Sealing earned "did numerically
outweigh weaknesses, as there was no identified weakness." Id. Nonetheless, the SSEB
concluded, "when considering the entire proposal for this factor, even in light of the specific
merit of the strength, the proposal did not demonstrate more than an adequate approach and
understanding of the requirements." Id. Therefore, the SSEB concluded that Sealing's response
to Problem Statement No. 4 did not merit a "Good" rating. Id.

Sealing challenges the SSEB's decision. It observes that the SSEB similarly downgraded
all offerors that the PSEB had assigned a "Good" rating and who had earned one strength and no
weaknesses for Problem Statement No. 4. Sealing MJAR at 31–32. It also notes that each time it
did so the SSEB used the same justification that the proposal reflected an "adequate" as opposed
to "thorough" approach to requirements. Id. at 32. It contends that the SSEB's real reason for
downgrading all of the proposals was to make them consistent with the "Acceptable" rating the

PSEB assigned to another offeror that had earned one strength and no weaknesses (Credence). Id. at 32. Sealing states that the SSEB's approach was "problematic," given the Solicitation's representation that the SSEB would not compare proposals against one another. Id. at 32; see AR Tab 5 at 394. It also notes that some of the training materials provided to the SSEB advised that it should "[a]void technical leveling or transfusion of one parties' technical approach with another." Sealing MJAR at 31 (quoting AR Tab 169 at 27967). Finally, it notes that the praise the PSEB offered for its proposal shows that the PSEB, at least, found that it had a "thorough" understanding of Problem Statement No. 4. Sealing MJAR at 33.

Sealing's argument—that the SSEB downgraded Sealing's rating for Problem Statement No. 4 in order to make it consistent with the rating the PSEB assigned to Credence—is pure speculation and is not supported by anything in the record. Indeed, the argument is counterintuitive. For if rote consistency were its goal, the SSEB could have more easily accomplished such consistency by upgrading Credence's rating, rather than lowering the ratings of the other offerors.

Further, the SSEB was charged with reviewing the TEB evaluations to ensure an "equitable, impartial, and comprehensive evaluation" against the Solicitation requirements. AR Tab 5 at 393. In so doing, the SSEB would necessarily have to review the adjectival ratings assigned and—to the extent that its assessment was different from that of the TEBs—adjust those ratings. See L-3 Commc'ns Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 462 (2007) (quoting Speedy Food Serv. Inc., B-258537, 95-2 CPD ¶ 111 (Comp. Gen. May 2, 1995)) (noting that the court generally "will not object to the higher-level official's judgment, absent unreasonable or improper action, even when the official disagrees with an assessment made by a working-level evaluation board or individuals who normally may be expected to have the technical expertise required for such evaluations"). As the Court has noted earlier in this opinion, the fact that the SSEB disagrees with a TEB regarding whether a proposal reflects an "adequate" or a "thorough" understanding of the Solicitation's requirements does not, in and of itself, signal that either body's determination was an irrational one. AR Tab 5 at 391. This protest ground therefore lacks merit.

### e.    Assignment of Adjectival Ratings

Finally, Sealing complains that the agency did not assign adjectival ratings "evenly" because proposals that had the same number of strengths and weaknesses did not always receive the same adjectival rating. Sealing MJAR at 35. Specifically, it observes that it received a "Marginal" rating for Factor 3, Problem Statement No. 3 where it earned three strengths and was assigned two weaknesses and one significant weakness. Id. On the other hand, GOVCIO received the same number of strengths and weaknesses under Factor 1, but was nonetheless rated "Acceptable." Id. Sealing also observes that the agency gave Cyber Data Technologies a "Marginal" rating under Problem Statement No. 3, even though it had earned fewer strengths than Sealing, and was assigned more weaknesses and significant weaknesses. Id. Finally, it notes that Tenica was assigned an "Acceptable" rating for its Problem Statement No. 4 where it earned two strengths and was assigned two weakness, one of which was "significant." Id. at 35–36.

As the Court has previously observed, agencies are not required to, and in fact are prohibited from, assigning adjectival ratings solely on the basis of the number of strengths and

weaknesses a proposal receives. Further, Sealing's call for adjectival ratings to be assigned "evenly" ignores that different TEBs evaluated each factor separately and that, as the Court has previously explained, the criteria for awarding particular adjectival ratings varied based on the factor being evaluated. Id. at 35. The issue is therefore not whether the ratings were assigned "evenly" but whether they were consistent with the criteria set forth in the Solicitation. Id.

For example, a rating of "Marginal" is appropriate under Factor 3 where the proposal has "one or more weaknesses which are not offset by strengths." AR Tab 5 at 391. While Cyber Data was assigned more weaknesses than Sealing for Problem Statement No. 3, the ratings criteria were satisfied because both proposals were assigned weaknesses that were not offset by strengths. And although Tenica had two strengths, one weakness, and one significant weakness for Problem Statement No. 3, it was still eligible to receive an "Acceptable" rating based on the agency's conclusion that—notwithstanding that its weaknesses were not offset by strengths—the imbalance would "have little or no impact on Contract performance." Id.

In short, the agency followed the Solicitation's criteria in assigning adjectival ratings. Sealing's challenge to the agency's decision-making process therefore lacks merit.

### G.    Foxhole Technology, Inc. (Case No. 19-1168C)

#### 1.    The Agency's Evaluation

Foxhole Technology, Inc. ("Foxhole") submitted its proposal on April 4, 2017. AR Tab 140 at 16165. The IEB assigned the proposal one strength and one weakness under Factor 1, earning Foxhole an "Acceptable" rating for that factor. AR Tab 65d at 5076. The proposal received a "Substantial Confidence" rating under Factor 2. Id. at 5078. For Factor 3, Problem Statement No. 3, the PSEB gave the proposal an "Outstanding" rating on the basis of its three earned strengths and no weaknesses. Id. at 5079. Foxhole also received an "Outstanding" rating for Factor 3, Problem Statement No. 4, earning two strengths and no weaknesses. Id. at 5080. It also earned an "Outstanding" rating for Factor 4 based on its seven strengths and no weaknesses. Id. at 5082–83.

The SSEB concurred with the TEBs on all ratings except the one assigned to Problem Statement No. 4. It downgraded that rating from "Outstanding" to "Good" on the grounds that "the specific merit of the two (2) strengths identified [for Problem Statement No. 4] did not indicate an exceptional approach and understanding of the requirements; rather, it indicated a thorough approach and understanding of the requirements." Id. at 5080–81.

The final ratings assigned to Foxhole's proposal by the agency were as follows:

| Factor 1 – Innovation | Factor 2 – Past Performance | Factor 3 – PS3 Rating | Factor 3 – PS4 Rating | Factor 4– Small Business |
|---|---|---|---|---|
| Acceptable | Substantial | Outstanding | Good | Outstanding |

Id. at 5084. Foxhole's proposal was priced at [***]. AR Tab 63a at 4658.

The SSAC observed that Foxhole's proposal "was priced in the upper half of all of the Offerors" and "was not one of the highest technically rated." AR Tab 65e at 5865. It therefore recommended against awarding a contract to Foxhole.

The SSA agreed. He explained that "the [S]olicitation was looking for Innovative Offerors." AR Tab 65 at 4659.94. He acknowledged Foxhole's established track record of past performance and that it had also shown its ability to solve the problems set forth in the problem statements. Nonetheless, Foxhole had failed to achieve a rating higher than "Acceptable" in the most important factor, and for that factor it was assigned "one weakness that was merely offset by only one strength." Id. He also noted Foxhole's relatively high price, which he stated he was not willing to tradeoff given that Foxhole had demonstrated a greater risk of unsuccessful performance than those offerors that achieved either a "Good" or "Outstanding" rating under Factor 1. Id.

## 2.  Foxhole's Protest

In its amended MJAR, Foxhole challenges several aspects of the agency's evaluation of its proposal. It argues that the agency should have assigned it at least a "Good" rating for Factor 1 because the weakness the agency assigned its proposal was unjustified and because the agency failed to recognize three additional strengths contained in the proposal. Pl. Foxhole Tech., Inc.'s Am. Mot. for J. on the Admin. R. ("Foxhole MJAR") at 22–23, ECF No. 108. In addition, Foxhole mounts a more global challenge to the agency's entire source selection process, similar to the challenges mounted by DVS, Tapestry, and CollabraLink. It contends that the agency did not conduct an adequate comparative assessment of the proposals, that it placed too much emphasis on the offerors' Factor 1 ratings, and that it failed to meaningfully consider price. Id. at 6. For the reasons set forth below, the Court finds that these arguments lack merit.

### a.  Factor 1 Evaluation

### i.  Weakness regarding cost of failure

Under section L.4.2.3.1 of the Solicitation, offerors were required, among other things, to discuss their approach to risk. They were instructed to explain how they "manage risk in an innovative environment"; how they "determine the level of acceptable risk"; and "how [they] and DoD should share risk." AR Tab 6 at 376. They were also asked to describe "the cost of failure," "who should pay for it," and "how much failure" the government should accept. Id.

In its response to the agency's questions about the cost of failure, Foxhole stated that [***]. AR Tab 140 at 16224–25. Foxhole then discussed [***]. Specifically, Foxhole stated that [***]. Id. at 16225. It proposed that [***]. Id.

The agency assigned a weakness to Foxhole's response because it found that the proposal "did not provide adequate information as to what the cost of failure is, who should pay for the cost of failure, or how much failure they believe the Government should accept." AR Tab 65 at 4659.92. It noted that Foxhole had [***] but that it did not [***] who should pay for failure or how much failure the Government should accept." Id. This flaw, the agency observed, "raises the risk of failure to be innovative" because Foxhole's "approach to failure sharing . . . is not well-developed and could potentially impede innovation on future SETI projects." Id.

Foxhole objects to the agency's assessment of a weakness. It contends that the "cost of failure" language in the agency instructions was ambiguous and that it "reasonably interpreted the question to refer to literal cost." Foxhole MJAR at 23–24. It further argues that it was "arbitrary and capricious for the Agency to assign a weakness to Foxhole for failing to interpret 'cost of failure' as the Agency intended." Id. at 24.

Foxhole's argument is somewhat of a non-sequitur. Foxhole's discussion of [***] was unresponsive to the agency's questions. Other than its generic observation that the "[l]ack of innovative input increases the mediocrity of the final output, and never tests the waters of 'what if' and 'why not,'" AR Tab 140 at 16224, Foxhole's response was not about the cost of failure at all (whether "literal" or figurative). Nor is there any discussion in its proposal about who should pay the costs of failure or how much failure the government should accept.

The Court is not persuaded by Foxhole's contentions that, in any event, it addressed failure sharing within its "overall response" to the questions posed under the Corporate Philosophy/Culture on Innovation category. Foxhole MJAR at 24. The statement Foxhole references was that [***]. Id. (emphasis removed) (citing AR Tab 140 at 16339). But this language (which was included in response to a different set of questions about incentivizing innovation by employees) concerns [***]. It does not address the extent to which such costs are ever shared with the government or how much failure the government should accept. Foxhole has failed to persuade the Court that it was irrational for the agency to assign it a weakness based on its failure to provide an adequate response to the agency's questions regarding the cost of failure.

### ii.     Additional strengths

Foxhole also contends that the agency should have assigned it three additional strengths under Factor 1. See Foxhole MJAR at 25–30. For example, the Solicitation provided that proposals "may be evaluated more favorably and achieve higher ratings" where they demonstrate, among other things, "sustained, year-after-year investment in technologies and innovative ways to develop new capability, improve service, reduce costs and create efficiencies [or] . . . ongoing corporate investment in tools, training, facilities, personnel and equipment." AR Tab 5 at 388. Foxhole argues that the frequent references in its proposal to its [***] support the assignment of a strength under this criteria. See Foxhole MJAR at 22–23 (observing that its proposal "included [***]," as well as descriptions of its benefits, and that [***]).

But as the Court has had frequent occasion to remark in this opinion, the decision whether to assign a proposal a strength based on its technical quality is one that lies within the exclusive discretion of the agency's subject-matter experts, subject to review only under a highly deferential rational basis standard. And while Foxhole argues that it should have been assigned a strength for its [***], it provides the Court no basis for concluding that by not doing so the agency violated the terms of the Solicitation or made a decision that lacked a rational basis.

Nor does Foxhole demonstrate that the agency engaged in disparate treatment by not assigning it a strength based on its Innovation Laboratory. Its contention that RedTeam, ValidaTek, and Rigil were all awarded a strength based on their possession or access to [***] is

unavailing because Foxhole does not show that the [***] were substantively indistinguishable. See id. at 26–28.

Rigil's proposal is not in the record. And the proposals of the other two offerors contain [***]. Compare AR Tab 140 at 16345 (Foxhole proposal), with AR Tab 152 at 22163–64 (RedTeam's proposal) and AR Tab 163 at 27255 (Validatek proposal). In fact, the agency relied on the [***] in assigning strengths to the proposals. See, e.g., AR 30032 (observing that the RedTeam proposal [***]).

Foxhole similarly contends that it should have earned two strengths under the "History of Engineering and Deploying Innovative Solutions" category. Foxhole MJAR at 28. The first strength the agency should have assigned, according to Foxhole, was based on [***]. Id. at 28. It claims that [***]. Id. (referencing AR Tab 5 at 388). But as with its contentions regarding [***], this argument represents a mere disagreement with the discretionary judgments of the agency's experts. Even if the Court possessed the technical expertise to offer its own judgment, the Court lacks the authority to do so under the highly deferential standard of review applicable to such determinations.

The Court similarly rejects Foxhole's argument that it should have been assigned another strength for its [***]. Id. at 29. Foxhole notes that the agency found that the work Foxhole performed on such a project was of "Very Good" quality when it was submitted as a past performance reference under Factor 2. Id. at 30 (citing AR Tab 61 at 3861). But different information is sought under Factors 1 and 2, and for different purposes. In addition, the evaluations are conducted by different TEBs, using different criteria, and considering only that information which is provided by the offeror in the applicable volume. Therefore, notwithstanding Foxhole's views regarding the value of this experience, it was within the agency's discretion not to credit it with a strength.

### b.     The Agency's Source Selection Determination and Best Value Tradeoff Analysis

Finally, Foxhole contends that—even assuming that the agency reasonably assigned it only an "Acceptable" rating for Factor 1—its protest should be sustained because the agency's source selection process was flawed. Specifically, it argues that the award decision was based on "a mechanical ranking of proposals, in which offerors that received the highest ranking under Factor 1 were all ranked first, regardless of their ratings for other factors." Id. at 7. Relatedly, it argues that the agency "placed [] undue weight on Factor 1" which it claims "ma[d]e the other evaluation factors essentially meaningless." Id. at 11–12. Finally, it argues that "in its focus on Factor 1," the agency "ignored the offerors' proposed prices." Id. at 20.

These arguments—which are similar to those made by DVS, CollabraLink, and Tapestry—are not supported by the record. As described above, the SSA carefully compared Foxhole's proposal to those of other offerors with higher ratings on Factor 1 and explained why—despite Foxhole's impressive showing on the other technical factors—he did not view its relatively high-priced proposal as providing best value to the government. See AR Tab 65 at 4659.94.

There is no question that proposals rated "Outstanding" under Factor 1 enjoyed a considerable advantage in this procurement. But that was entirely consistent with the Solicitation, which expressly stated that Factor 1 was the most important factor and which repeatedly emphasized the agency's "paramount" interest in innovation. See AR Tab 5 at 375 (Solicitation stating that "fostering a creative culture and driving innovation in defense of the country[] are paramount success criteria in executing the SETI contract").

Foxhole acknowledges that it understood that Factor 1 would be given the most weight. It contends, however, that the quantum of weight afforded to Factor 1 was so disproportionate as to constitute an unstated evaluation criterion. But as noted earlier in this opinion, to successfully make this claim, an offeror must show that the agency used "a significantly different basis" than the one stated in the Solicitation for making its decision. Wellpoint Military Care Corp., 144 Fed. Cl. at 404. Foxhole has not made that showing here because the record does not support its argument that the importance that the agency placed on Factor 1 was so overwhelming as to make meaningless all other considerations, including price.

For one thing, five of the twenty-three offerors that received an "Outstanding" rating under Factor 1 were not awarded a contract. Three of these offerors were disqualified at the outset because their proposals received "Unacceptable" ratings for Factor 3. AR Tab 65 at 4659.4–.5. The other two offerors (one of whose proposals was the lowest priced of all ninety-nine evaluated) were not awarded contracts because they received "Marginal" ratings on the problem statements and lacked a record of relevant past performance. See id. at 4659.46–.48; id. at 4659.48–.52.

The Court also finds contrary to the record Foxhole's argument that the agency failed to give meaningful consideration to price. Foxhole's proposal was priced higher than fourteen of the eighteen awardees that received "Outstanding" ratings for Factor 1. See AR Tab 174 at 30012–13. And the SSA specifically remarked on the significance of Foxhole's relatively high price, explaining that he was unwilling to pay a higher price for a proposal that had achieved only an "Acceptable" rating for Factor 1. AR Tab 65 at 4659.94.

The five awardees that received "Good" ratings for Factor 1 had technical ratings for the remaining factors that were either better than, equivalent to, or only slightly less favorable than Foxhole's. AR Tab 174 at 30013. And all of the awardees that received a "Good" rating for Factor 1 were ranked lower in price. Id.

The specific examples Foxhole cites to prove that the agency gave undue weight to Factor 1 at the expense of other technical factors do not hold water. For example, it complains that ValidaTek, "which received an 'Outstanding' in Factor 1 but only a 'Satisfactory' in Factor 2," was ranked higher than Foxhole, which "had a lower rating in Factor 1 but a rating two levels above ValidaTek in Factor 2." Foxhole MJAR at 9. But because Factor 1 was more important than Factor 2, there was nothing illogical about the agency choosing to make an award to the offeror whose proposal was rated two levels higher for Factor 1, rather than the proposal that was rated two levels higher for Factor 2, particularly since [***].

Foxhole similarly states that "it is simply illogical to conclude that an offeror such as Affinity Innovations, which received a 'Neutral' in Factor 2, 'Marginal/Acceptable' in Factor 3,

and 'Good' in Factor 4, was objectively a technically superior offeror than Foxhole who received ratings two levels higher in every category other than Factor 1." Id. at 9–10. But Foxhole fails to mention that [***], as well as one of the lowest among all of the awardees, and that it was significantly lower than Foxhole's. See AR Tab 65b at 4676.

It bears noting that there were another twenty offerors that received "Good" ratings on Factor 1 and yet did not receive an award because of their weaker ratings on one or more of the other three technical factors. In short, the record establishes that while the agency gave the greatest weight to Factor 1 (consistent with the Solicitation), Foxhole's argument that the other technical factors or price were "essentially meaningless," is not supported by the record.

The Court has examined Foxhole's remaining objections to the agency's decision to make awards to offerors that had lower ratings on Factors 2, 3, or 4 and finds them unpersuasive. It is for the agency to decide which proposals present the best value to the government, and so long as those determinations are not irrational and are adequately documented, the Court must uphold them. See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004); E.W. Bliss Co., 77 F.3d at 449. Here, the agency carefully evaluated close to one hundred proposals using a two-level review process to assess their strengths and weaknesses and to assign adjectival ratings to each of the four technical factors. It documented the basis for its evaluations and rating decisions. The SSAC provided a comparative analysis of the proposals and made recommendations to the SSA. The SSA made its best value determinations, giving the greatest weight to Factor 1 (as provided by the Solicitation). The SSA explained his justification for selecting some but not other offerors for an award. Foxhole's claims regarding the overall process the agency employed in making its best value determination are therefore rejected.

## CONCLUSION

Based to the foregoing, the Court issues the following orders:

1.  The government's motion for judgment on the administrative record is **GRANTED**. ECF No. 123.

2.  TIA's motion for judgment on the administrative record is **DENIED**. ECF No. 106.

3.  DVS's motion for judgment on the administrative record is **DENIED**. ECF No. 84.

4.  Tenica's motion for judgment on the administrative record is **DENIED**. ECF No. 71.

5.  Tapestry's motion for judgment on the administrative record is **DENIED**. ECF No. 80.

6.  CollabraLink's motion for judgment on the administrative record is **DENIED**. ECF No. 104.

7.      Sealing's motion for judgment on the administrative record is **DENIED**. ECF No. 102.

8.      Foxhole's motion for judgment on the administrative record is **DENIED**. ECF No. 108.

**IT IS SO ORDERED.**


                                        s/ Elaine D. Kaplan
                                        ELAINE D. KAPLAN
                                        Judge